**NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC., Plaintiff–Appellant,**

v.

**NATIONAL FEDERATION OF FEDER-AL EMPLOYEES, and Maria Luisa A. Inocencio, Defendants–Appellees.**

No. 87–1158.

United States Court of Appeals, Fifth Circuit.

May 5, 1988.

Edward F. Sherman, Austin, Tex., Stewart W. Forbes, El Paso, Tex., Robert H. Goldman, Alan M. Cohen, Lowell, Mass., for plaintiff-appellant.

Bruce P. Heppen, Ronald P. McCluskey, El Paso, Tex., for defendants-appellees.

Before RUBIN, KING, and WILLIAMS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

"[Labor] representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions."[1] The certification contest between two unions from which this libel action arose was comparatively mild. The union seeking to supersede the incumbent bargaining agent did, however, publish a pamphlet stating in one paragraph that the incumbent union had refused to help an employee because she was not a union member and perhaps implying that the employee was consequently forced to return to her job while pregnant and later died as a result.

The incumbent union thereupon brought a defamation action against the challenger and two persons who had participated in confecting the statement. The jury ruled for the defendants because the plaintiff union had not proven its case by "clear and convincing evidence." The district court then imposed sanctions on the plaintiff for having brought the lawsuit, even though the court had earlier suggested both sides were at fault and should settle their dispute.

We affirm the jury verdict for the defendants because the plaintiff failed to show "with convincing clarity" that the defendants had published the statement with "actual malice."[2] We find, however, that the district court abused its discretion in imposing sanctions, and we vacate that part of the judgment.

I.

The National Association of Government Employees was the collective bargaining representative of 1,600 civilian employees of the United States Army at Ft. Bliss, Texas. Seeking to displace the Association, the National Federation of Federal Employees petitioned for a representation election. The electioneering activity was intense. During its course, the Federation decided to publish a pamphlet containing employees' criticisms of the incumbent Association. An employee supporting the Federation, Maria Inocencio, asked a fellow employee, Connie Dawkins, to give her a statement about the plight of a fellow employee, Marsha Kennedy, who had died recently. Dawkins testified that Inocencio had asked for a statement but had represented that it would be used to raise funds for Kennedy's daughter, and that Inocencio

---

1. *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 58, 86 S.Ct. 657, 661, 15 L.Ed.2d 582 (1966).

2. *See New York Times Company v. Sullivan,* 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 726, 728–29, 11 L.Ed.2d 686 (1964).

had dictated most of the statement. Inocencio testified that she had not misinformed Dawkins and that Dawkins had provided the statement voluntarily.

Whatever her motives, however, Dawkins signed a statement that read:

In 1981, my friend, Marsha Kennedy (6 mos pregnant) had to take sick leave, resultant of her pregnancy. She told me that she was harrassed at home about her use of sick leave, and that she had contacted the union (NAGE) for help, but was turned down, because she was not a member. Due to the pressure received, Marsha returned to her job, where she later passed, during pre-mature deliver.

Inocencio delivered Dawkins's statement to a Federation employee, Heather Newell. After a conference with Dawkins, Newell edited or altered the statement to read:

In 1981, my friend, Marsha Kennedy (6 months pregnant), had to take sick leave due to her pregnancy. Her supervisor began harrassing her at home about her use of sick leave, so she contacted NAGE for help. NAGE refused to help her because she was not a member. Marsha was forced to return to her job and during pre-mature delivery, passed away.

In fact, evidence adduced at trial showed that Kennedy had been a temporary employee and not a member of the bargaining unit represented by the Association. The Army had terminated her employment sometime after she had returned to work, and she had not died until five months after she left Ft. Bliss. She had been six months pregnant at the time she died, not at the time NAGE had allegedly refused to aid her. Furthermore, Dawkins testified, it had been Kennedy's husband and friends who had harassed her for staying home, not her supervisor as the edited statement asserted.

During the week before the election, a Federation representative told the Association's Executive Secretary, "Tomorrow we are going to drop a bombshell on you." The next day the Federation distributed a four-page pamphlet entitled "Your Co-Workers Speak Out: 'Why I'm Voting for NFFE.'" The pamphlet, which had been assembled by Newell, contained statements by eleven employees critical of the Association, including the edited version of Dawkins's statement.

Association witnesses testified that they considered Dawkins's statement as published untrue and defamatory. According to the Association, Federation officials admitted the "wording [of the statement] was wrong" but refused to retract it. The Association's Secretary immediately telephoned Dawkins and asked for a retraction, but according to the Secretary, Dawkins hung up the phone. Dawkins testified that she had hung up because she hadn't known either that any statement had been published or that her own statement had been altered and she had not wanted to be bothered on the job.

In the election, the Association received 94 votes more than the Federation but failed by four votes to obtain the required "50 percent plus one." A runoff election was therefore required and was pending when this suit was filed. Association officials testified that the statement regarding Kennedy had been a "blow to us" that had affected the outcome of the election.

Invoking diversity jurisdiction, the Association sued the Federation, Inocencio, and Dawkins for defamation. Dawkins filed cross-claims against Inocencio and the Federation, and Inocencio in turn filed a counterclaim against the Association.

Before trial, the district court denied the defendants' motions for summary judgment. Trial was scheduled and postponed five times. A month before trial, the case was reassigned to another district judge, who denied any further postponements and held a pretrial conference at which he attempted to convince the parties to settle the case. The court held a second settlement conference in chambers before beginning the trial.

At the close of the Association's case, the court denied the defendants' motions for directed verdicts but warned the Association that he regarded its case as weak. Once more, however, the court proposed a settlement, recommending among other

things that the Federation "ought to pull out; [it] ought not to have anything to do with Fort Bliss for at least five years" and "ought to apologize for its distribution [of the statement] for negligence." The parties were again unable to agree. At the conclusion of the evidence, the court denied a second motion for directed verdict.

In answer to special interrogatories, the jury decided that the statement published was defamatory but was not false in any "important factual aspect" and that there was "not clear and convincing evidence that the written statement was published with actual malice by any of the defendants." The jury also rejected Dawkins's cross-claims and Inocencio's counterclaim.

Upon receipt of the jury verdict, the court stated, in the presence of the jury, that it "would have done the very same thing"; the suit "should never have been filed"; the Association had misused the courts and the jurors; the Association had disserved its members, and they should sue it for the money spent in the case; and the defendants' attorneys should submit their expenses and the court would determine "whether under Rule 11 or Rule 27 I can put every bit of this cost on the plaintiffs." The court added, however, that the Federation had not been "all that innocent; they ought to know better than to print that thing from Connie Dawkins; they ought to check on it."

A week later, the district court entered a take-nothing judgment as to all claims and stated that it would enter such orders concerning sanctions under Federal Rule of Civil Procedure 11 as it deemed appropriate. Acting on its own motion, the court later entered an order stating that "plaintiff's lawsuit was frivolous" and the plaintiff should pay the defendants the costs they had incurred in defending the case. It ordered the Association to pay $14,276 to the Federation's attorneys, $8,276 for costs and $6,000 for fees.

The court later entered "Findings of Fact and Conclusions of Law," stating that: (1) it had suggested a possible settlement agreement at a pretrial conference, but the parties had not accepted it; (2) once it had heard testimony, the evidence had shown that the lawsuit had been brought "not because the plaintiff had a cause of action that truly had merit, but was brought more for the purpose of harassing the defendant and to serve as a campaign tactic"; (3) for the plaintiff to have prevailed, the jury would have had to conduct "extensive extrapolating and bootstrapping" and the plaintiff would have needed "a great deal of luck"; (4) at the close of the plaintiff's case, the court had told the parties that the case should be settled, it was inclined to direct a verdict for defendants but was not willing to do so at that time, and it was considering imposing sanctions; and (5) at the close of all the evidence, the court had again suggested settlement and warned that it might take away any verdict rendered for the plaintiff, but "[o]nce again, the plaintiff refused to settle [its] cause."

The court's "Conclusions of Law" stated that (1) the Association's suit "was lacking in its factual and legal basis" and "was brought for the improper purpose of harassing defendants and for the purpose of gaining an advantage in an upcoming campaign"; and (2) Rule 11 allows imposition of sanctions "where a sufficient factual basis is wanting or where the filing is made for an improper purpose."

The Association appeals. Although both parties devote the major portions of their briefs to the propriety of the imposition of sanctions, we first review the jury's verdict.

## II.

The First Amendment prohibits a public official [3] or public figure [4] from recovering damages for defamation unless he proves that the defamatory statement was false

3. *New York Times,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

4. *Curtis Publishing Co. v. Butts and Associated Press v. Walker,* 388 U.S. 130, 162–66, 87 S.Ct.

1975, 1995–97, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).

and was published with "actual malice—that is, with knowledge that [the statement] was false or with reckless disregard for whether it was false or not."[5] The plaintiff must prove the requisite actual malice not by a mere preponderance of the evidence, but with "convincing clarity."[6] Because the policy of encouraging "uninhibited, robust, and wide-open" debate on matters of public concern extends to labor-management disputes, these standards apply in actions brought by a union for defamatory statements circulated during an election campaign.[7]

The Association contends that there was insufficient evidence to support the jury findings both as to falsity and malice. We consider the latter first, since the Association also argues that the instructions concerning falsity were incorrect.

The parties have noted only in passing the proper standard of appellate review. Although we usually review a jury verdict deferentially,[8] we must decide independently, in a libel case involving a public official or public figure, whether the record as a whole presents clear and convincing proof of "actual malice"[9]—whether the trier of fact was the district judge or a jury[10] and whether or not it found actual malice.[11] The Supreme Court explained in *Bose Corp. v. Consumers Union of U.S., Inc.*[12] that this rule is a principle of federal constitutional law and stems from the judges'

duty to interpret the Constitution by applying it in varying factual circumstances.

In the context of labor elections, however, the "actual malice" standard applies "by analogy, rather than under constitutional compulsion"; it vindicates the federal policy, embodied in the labor statutes, of encouraging free debate in labor-management disputes but still accords weight to the states' interest in protecting their citizens' reputations.[13] Because the "actual malice" standard applies here as a matter, at least formally, of statutory rather than constitutional interpretation, we would extend *Bose*'s rationale were we to hold that independent appellate review is required in this context as well.

■ We will assume, however, without deciding, that we should exercise such independent judgment in this case, for in any event, the Association did not produce "clear and convincing evidence" that the defendants acted with actual malice in publishing Dawkins's statement. The burden to present clear and convincing evidence is a heavy one, requiring more than that the preponderance of the evidence point to a finding of malice.[14] When the testimony concerning "actual malice" has conflicted or could plausibly be interpreted either way, we have concluded that the plaintiff has not met his burden.[15]

■ Although the Association produced virtually no evidence that the defendants

**5.** *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726.

**6.** *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 728–29; *see also Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2508, 91 L.Ed.2d 202 (1986); Rotunda, Nowak, and Young, 3 Treatise on Constitutional Law: Substance and Procedure § 20.33(c) at 168 (1986).

**7.** *Linn,* 383 U.S. at 62–63, 65, 86 S.Ct. at 663, 664 (*quoting New York Times,* 376 U.S. at 270, 84 S.Ct. at 721); *Old Dominion Br. No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 272–73, 94 S.Ct. 2770, 2775, 41 L.Ed.2d 745 (1974).

**8.** *Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc).

**9.** *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984).

**10.** *Levine v. CMP Publications, Inc.,* 738 F.2d 660, 674 (5th Cir.1984).

**11.** *Bartimo v. Horsemen's Benevolent and Protective Ass'n,* 771 F.2d 894, 897–98 (5th Cir.1985).

**12.** *Bose,* 466 U.S. at 510–11, 104 S.Ct. at 1965.

**13.** *Linn,* 383 U.S. at 62–63, 65, 86 S.Ct. at 662, 664; *see also Austin,* 418 U.S. at 272, 94 S.Ct. at 2775; National Labor Relations Act § 8(c), 29 U.S.C. § 158(c).

**14.** Nowak, Rotunda, and Young, 3 Constitutional Law at 168 (cited in note 6).

**15.** *See McKinley v. Baden,* 777 F.2d 1017, 1021–22 (5th Cir.1985).

knew that part of the statement they were publishing was false, the record contains some evidence from which a jury might have inferred that they showed reckless disregard for its truth or falsity. There was evidence that Inocencio was angry at the Association because it had terminated her membership and that the Federation knew of her feelings. In addition, the Federation knew of the gravity of the charge in the statement but made no attempt to verify it before publication and refused to retract it thereafter, facts that may evince the requisite malice.[16] Finally, the editing performed on the statement in some ways strengthened the negative inference readers might have drawn from it.

The record as a whole, however, does not establish the defendants' malice with convincing clarity. Evidence presented by the Federation tended to disprove Dawkins's claim that Inocencio had misrepresented the statement and its purpose, and to prove that Inocencio had been unaware of the details of Marsha Kennedy's death or, at most, had interpreted them mistakenly. The record also contains a great deal of testimony that the statement as published did not differ substantially from the version Dawkins had given and that Federation officials had no indication the statement was inaccurate before they published it. Finally, the Association's Executive Secretary admitted that the placement of Dawkins's statement in the campaign circular did not call particular attention to it.

The evidence on both sides was testimonial, and much turned on the credibility of the witnesses, a matter on which, even after *Bose*, we must respect the jury's conclusions.[17] We therefore conclude that the Association failed to carry its burden of showing "actual malice" by clear and convincing evidence.

16. *See, e.g., Babb v. Minder,* 806 F.2d 749, 756 (7th Cir.1986); *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1071 (5th Cir.1987).

17. *Bose,* 466 U.S. at 499–500, 104 S.Ct. at 1959; *Zerangue,* 814 F.2d at 1071; *McKinley,* 777 F.2d at 1022; *Cranberg v. Consumers Union of U.S., Inc.,* 756 F.2d 382, 388 (5th Cir.1985).

### III.

The Association also contends that the district court abused its discretion by not granting it a new trial. The court could have ordered a new trial if, after weighing the evidence for itself, it had believed the jury's verdict was contrary to the weight of the evidence.[18] We may reverse its decision not to grant a new trial, however, only if there is an "absolute absence" of evidence to support the verdict.[19] We need not determine whether *Bose* affects that standard in libel cases. For the reasons we have already given, we are not prepared to say that the jury's verdict was contrary to the weight of the evidence.

A court may also order a new trial if some misadventure at trial irreparably prejudiced the jury's verdict.[20] The Association contends that it was irreparably prejudiced when counsel for the Federation and its codefendant elicited and received answers pertaining to "prior-bad-act evidence" in violation of Federal Rules of Evidence 403 and 404.

Counsel for the Federation was questioning one of the Federation's witnesses, Elizabeth Molina. The pertinent part of the record reads:

Q. Explain to the jury how you felt like, Ms. Molina, that you have been harassed by the NAGE Local here in El Paso.

A. At the time when we had the petition we were trying to get people—

Thereupon, the Association objected and asked for a mistrial. The district court stated:

Insofar as a mistrial is concerned, I would grant same except I have six people over there who have two or three days invested, of their lives invested in

18. *United States v. An Article of Drug Consisting of 4680 Pails,* 725 F.2d 976, 989–90 (5th Cir. 1984).

19. *Id.* at 990 (*citing Litherland v. Petrolane Offshore Construction Services,* 546 F.2d 129, 132 (5th Cir.1977)).

20. *Eximco, Inc. v. Trane Co.,* 737 F.2d 505, 512 (5th Cir.1984).

this lawsuit, and I am going to deny the motion for mistrial. The objection is overruled but we are not going into previous acts with this witness.

The court's remark that it would have granted a mistrial but for the fact that the jury members would have wasted their time was not, as the Association suggests, a ruling that the question had been so prejudicial as to require a retrial. The question, even if improper, elicted no damaging testimony. The trifle of testimony given in answer to the question, so quickly interrupted, did not cause such prejudice as to warrant a mistrial or a sua sponte jury instruction.

## IV.

Finally, we review the district court's imposition of sanctions under Federal Rule of Civil Procedure 11. That rule provides in relevant part:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction.

Our recent en banc decision in *Thomas v. Capital Security Services, Inc.,* [21] an opinion not available to the district court at the time of trial, requires that we review the court's imposition of sanctions only for abuse of discretion.[22]

■ The district court did not suggest that the Association or its counsel had signed any paper without complying with Rule 11 or had failed to investigate prior to filing the complaint. Instead, the court referred to the Association's conduct in bringing and prosecuting a meritless lawsuit. As we pointed out in *Thomas,* however, Rule 11 focuses on an attorney's obligation "at the time a 'pleading, motion, or other paper' is signed," [23] and sanctions "should not amount to an 'accumulation of all perceived misconduct, from filing through trial,' resulting in a 'single post-judgment retribution in the form of a massive sanctions award.' " [24] Rule 11, therefore does not permit the imposition of sanctions simply for bringing a meritless lawsuit, without any finding that a party or his lawyer signed a paper in violation of the Rule.

■ The district court might, however, have relied, in its reference to "Rule 27," upon 28 U.S.C. § 1927, which authorizes the imposition of sanctions on any person who "multiplies the proceedings in any case unreasonably and vexatiously." In *Thomas,* we noted that this section prohibits "the persistent prosecution of a meritless claim." [25] In this regard, the district court stated that the Association's suit lacked true merit and could have succeeded only with good fortune and "extensive extrapolation and bootstrapping" by the jury. The court, however, acted on the basis of the perceived lack of merit in the litigation despite the fact that it had thrice urged the defendants to pay something to settle it. If the litigation were frivolous, the court should certainly have known it by the time the Association had adduced all of its evidence and rested. There is patent anomaly then in its imposition of sanctions for filing a suit that it considered worthy of compromise.

21. 836 F.2d 866 (5th Cir.1988) (en banc).

22. *Id.* at 872.

23. *Id.* at 874.

24. *Id.* at 881 (*quoting In re Yagman,* 796 F.2d 1165, 1183 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987)).

25. 836 F.2d at 875.

The court, in addition, denied directed verdicts both at the conclusion of the Association's evidence and at the end of the case. While this may have been a prudent precaution against possible later reversal on appeal, the court did not merely reserve judgment or grant the motion after receiving the jury's verdict. Instead it entered judgment on the verdict. As Judge William Schwarzer has stated: "One might well wonder how a case could be so frivolous as to warrant sanctions if it has sufficient merit to get to trial." [26]

Moreover, in denying the Federation's motion for a directed verdict at the close of the Association's case, the court observed that the Federation "should have some responsibility in this," because it had not checked the statement, and should "apologize for its distribution for negligence." The court, therefore, found some merit, if not the requisite clear and convincing showing, in the Association's allegation that the Federation had acted recklessly. Such negligence would constitute evidence of "actual malice." [27] In addition, the court proposed a sweeping remedy for the Federation's carelessness—that it be barred from Fort Bliss for five years and apologize for distributing the statement—yet when the trial had ended, the court placed all the blame on the Association for the parties' failure to settle before trial.

As we have pointed out, the Association indeed produced evidence of malice although it failed to establish that element with convincing clarity. The Association, therefore, did not proceed so "unreasonably and vexatiously" as to warrant sanctions under 28 U.S.C. § 1927.

■ As a second ground for sanctions, the court noted that the Association had not accepted the settlements the court had suggested at the pretrial conference or at the close of its case. Failure to compromise a case, however, even pursuant to terms suggested by the court, does not constitute grounds for imposing sanctions —especially when, as in this case, both parties make colorable arguments but the burden of sanctions falls entirely upon one. [28]

■ As a third reason for its action, the court concluded that the Association had brought suit "not because [it] had a cause of action that truly had merit, but ... more for the purpose of harassing the Defendant and to serve as a campaign tactic." In these remarks, the court did not find either that the suit was totally lacking in merit or that it was brought solely to harass and gain a campaign advantage; it found that these were the major motives.

We do not condone litigation instituted for ulterior purposes rather than to secure judgment on a well-grounded complaint in which the plaintiff sincerely believes. Yet the Rule 11 injunction against harassment does not exact of those who file pleadings an undiluted desire for just deserts. In *Zaldivar v. City of Los Angeles*, [29] the Ninth Circuit held that the filing of a complaint that complies with the "well grounded in fact and warranted by existing law" prong of Rule 11 cannot, as a matter of law, "harass" the defendant as Rule 11 forbids, regardless of the plaintiff's subjective intent. [30] In a footnote in *Robinson v. National Cash Register Co.*, [31] a decision that was in another respect overruled by *Thomas*, [32] a panel of this circuit agreed with *Zaldivar* that if an initial complaint passes the test of non-frivolousness, its filing does not constitute harassment for the purposes of Rule 11.

26. William W. Schwarzer, Rule 11 Revisited, 101 Harv.L.Rev. 1013, 1019 & n. 7 (1988).

27. *Bose Corp. v. Consumers Union of United States*, 692 F.2d 189, 196 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir.1969).

28. *See Kothe v. Smith*, 771 F.2d 667, 669–70 (2d Cir.1985); *Del Rio v. Northern Blower Co.*, 574 F.2d 23, 26 (1st Cir.1978).

29. 780 F.2d 823 (9th Cir.1986).

30. *Id.* at 832; *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1538 (9th Cir. 1986).

31. 808 F.2d 1119, 1130 n. 20 (5th Cir.1987).

32. *See* 836 F.2d at 871–73.

The *Zaldivar* rule comports with the text and spirit of amended Rule 11. The history of the Rule, as traced by the *Zaldivar* court, indicates that "subjective bad faith" is no longer an element in Rule 11 inquiries.[33] Instead, the court must focus on objectively ascertainable circumstances that support an inference that a filing harassed the defendant or caused unnecessary delay.[34] As Judge Schwarzer has stated: "If a reasonably clear legal justification can be shown for the filing of the paper in question, no improper purpose can be found and sanctions are inappropriate."[35] Amended Rule 11 mandates the court to focus on objective circumstances in determining whether an attorney has conducted "reasonable inquiry" and a paper is "well grounded" in fact and law,[36] and purely subjective elements should not be reintroduced into the determination concerning "improper purpose."

Like the *Zaldivar* court, we do not hold that the filing of a paper for an improper purpose is immunized from Rule 11 sanctions simply because it is well grounded in fact and law. The case can be made, for example, as *Zaldivar* noted, that the filing of excessive motions, even if each is "well grounded," may under some circumstances constitute "harassment" sanctionable under the Rule.[37] A plaintiff must file a complaint, however, in order to vindicate his rights in court. We find no indication that the filing here was unnecessary, for the Federation had refused to retract the statement. Under the circumstances, the Association had a proper interest in suing to attempt to vindicate its reputation.

The court based its decision to impose sanctions on three district court cases, each of which is inapposite. In *William Passalacqua Builders v. Resnick Developers South,*[38] the court, upon motion, awarded sanctions for the filing of two motions the second of which raised no new issues not raised in the first. In *Day v. Amoco Chemicals Corp.,*[39] the court, upon motion, imposed sanctions under 28 U.S.C. § 1927 and Rule 11 on a plaintiff who, after his complaint had been adjudged frivolous and malicious and had been dismissed with prejudice, filed a motion to correct an alleged misstatement in the record, a motion to disqualify the judge, and a second motion to vacate judgment. The court noted that the pro se plaintiff had filed several other suits in the Southern District of Texas and had in all but one filed a motion to disqualify the judge.[40] In *Taylor v. Prudential-Bache Securities, Inc.,*[41] the plaintiff, likewise pro se, had filed six consolidated suits, all frivolous, against various defendants, and the court found that the plaintiff had engaged in "particularly egregious and unjustified litigiousness."

Each of these cases involved repetitious or excessive filings. The filing of an original complaint, as we noted above, presents no such redundancy and, therefore, when the allegations of the complaint are well grounded, cannot generally serve as a basis for imposing sanctions.

We conclude, therefore, that the district court abused its discretion in imposing sanctions on the Association.

For these reasons, the judgment is AFFIRMED insofar as it rejects the Association's libel claim and REVERSED insofar as it imposes sanctions on the Association. Costs in the district court are taxed against the Association. Each party is to pay its own costs on appeal.

**33.** *Zaldivar,* 780 F.2d at 829; William W. Schwarzer, Sanctions Under the New Federal Rule 11, 104 F.R.D. 181, 195 (1985).

**34.** Schwarzer, 104 F.R.D. at 195.

**35.** *Id.* at 196.

**36.** *Id.* at 191–92.

**37.** *Zaldivar,* 780 F.2d at 832 n. 10.

**38.** 611 F.Supp. 281, 285 (S.D.N.Y.1985).

**39.** 595 F.Supp. 1120, 1121–22 & n. 1 (S.D.Tex. 1984), *appeal dismissed,* 747 F.2d 1462 (5th Cir. 1984), *cert. denied,* 470 U.S. 1086, 105 S.Ct. 1849, 85 L.Ed.2d 147 (1985).

**40.** *Id.*

**41.** 594 F.Supp. 226, 227 (S.D.N.Y.1984), *aff'd,* 751 F.2d 371 (2d Cir.1984).