**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-50409
Summary Calendar
_____

STANLEY E. REED,

Plaintiff-Appellee,

VERSUS

CHEVRON PIPE LINE COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
(MO-94-CA194)

_____

April 8, 1996

Before KING, SMITH, and BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Defendant Chevron Pipe Line Company ("CPL") appeals a judgment, entered after a jury verdict, for plaintiff Stanley E. Reed on his claim of compelled self-publication defamation.[1] Concluding that the evidence is insufficient to support the

---

[*] Local Rule 47.5.1 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that rule, the court has determined that this opinion should not be published.

[1] Reed's complaint alleged several other claims, but judgment for Reed was entered only as to the claim of compelled self-publication defamation. Reed has not appealed the judgment regarding his other claims.

verdict, we reverse and render judgment for the defendant.

I.

Stanley Reed worked for CPL and its corporate predecessor, Gulf Oil Corporation, for twenty-one years until CPL terminated him. During his last year of employment, he worked as a supervisor at CPL's Odessa office. Most of Reed's time was spent in the office rather than in the field. Two clerical employees, Maria Salgado and Paula Roberts, also worked at the Odessa office. Their duties also required them to spend most of their time in the office.

In May of 1993, Salgado and Roberts contacted a supervisor in another office to report Reed for allegedly hostile, harassing, and intimidating behavior. Salgado also reported Reed's alleged behavior to Dub Brown, one of CPL's human resources representatives.

Brown investigated Salgado and Roberts's allegations, concluding that Reed had created a hostile work environment and had intimidated the two women in violation of CPL's corporate policies. Brown reported his conclusions to Gary Williams, Reed's direct supervisor in Houston. Based on Brown's investigation, Williams referred Reed to CPL's employee assistance program ("EAP").

As part of his participation in CPL's EAP, Reed was required to undergo counseling with a psychologist, Dr. Perry Marchioni. After this initial round of counseling, Marchioni determined that Reed was fit to return to work. He in fact returned to work on

2

June 2, 1993.

Shortly thereafter, Salgado's supervisor in Odessa called Bob Kinnear, another member of CPL's management, to allege that Reed was retaliating against Salgado and Roberts. Kinnear called Reed and ordered him to go home but did not terminate him at that time. Instead, he referred Reed back to the EAP for extensive counseling.

Marchioni referred Reed to a hospital to confirm that there was no physical cause for his alleged behavior. Marchioni began seeing Reed on a regular basis for counseling purposes and, after several visits, concluded that Reed suffered from several personality disorders. Marchioni also concluded that further attempts at therapy would be futile and recommended that Reed be placed in a position with limited or no supervisory duties.

Upon receiving Marchioni's report, CPL directed Brown and Jeanne SuminskiSSan in-house attorney for Chevron Corporation, CPL's parent companySSto conduct further investigations. They held further interviews, from which they concluded that Salgado and Roberts's complaints were valid.

CPL also called in outside consultantsSSpsychologists specializing in workplace violenceSSto consider Reed's alleged behavior. These psychologists confirmed Brown and Suminski's determination that the complaints against Reed were valid and concluded, in addition, that Reed could become potentially violent when faced with a stressful situation, such as termination. They recommended that, if CPL decided to terminate Reed, it should hire security for both the location of the termination and the Odessa office for the

3

three days following termination.

Based upon the results of all of these investigations and examinations, Brown determined that the allegations against Reed were true and in violation of CPL's corporate policies. He reported those conclusions to Kinnear, whoSSafter conferring with Brown, Suminski, and others involved in the investigation of ReedSSthen decided to terminate Reed. After Reed refused CPL's offer to allow him to resign, Kinnear terminated him on November 11, 1993, on the ground that he had engaged in sexual harassment and improper conduct.

Reed introduced no evidence contravening these facts, although he did hotly dispute at trial the substantive results of the investigations and examinationsSS*i.e.*, he did adduce evidence to support his arguments that he was not psychologically dysfunctional, that he had not engaged in sexual harassment and improper conduct, and that CPL had erred in concluding that Salgado's and Roberts's complaints were valid.

It is undisputed that no CPL employee ever communicated the reasons for Reed's termination to a third party, including any of Reed's prospective employers. Reed testified, however, that he felt compelled, in employment interviews, to disclose the stated reasons for his termination.

At trial, Reed introduced no evidence from which to infer that Kinnear, Williams, Brown, or Suminski personally disbelieved either (1) that Reed had engaged in sexual harassment and other improper conduct or (2) that he had been fired for the reasons given to him.

4

CPL introduced affirmative evidence that Brown (1) believed the allegations against Reed and (2) believed that Reed was terminated for the reasons CPL had advanced.

## II.

The jury returned a verdict for Reed on the compelled self-publication defamation claim, and the district court entered judgment accordingly. CPL moved for judgment as a matter of law (1) at the close of the plaintiff's case; (2) at the close of all evidence; and (3) after the verdict. It also moved for post-judgment relief.

We review the verdict for sufficiency of the evidence. *See Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc). In so doing, we note that (1) "[a] mere scintilla of evidence is insufficient to present a question for the jury," and (2) "[t]here must be a conflict in substantial evidence to create a jury question." *Id.* at 374-75.

## III.

Except for the differences in procedural posture and standard of review, this case is virtually indistinguishable from our decision last year in *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308 (5th Cir. 1995). In that case, the plaintiff sued under a theory of compelled self-publication defamation, alleging that his former employer was liable for damages "because it was reasonably foreseeable that he would as a practical matter be required to tell

prospective employers of the allegedly defamatory reason for his termination." *Id.* at 311. As we did in *Duffy*, we assume *arguendo*, without deciding, that a publication had occurred in this case and that a cause of action for compelled self-publication defamation exists under Texas law. *See id.* at 312 n.5.[2]

We held in *Duffy* that, under Texas law, "'[a] communication on a subject in which the author or the public has an interest, or with respect to which the author has a duty to perform to another owing a corresponding duty, may constitute a qualified or conditional privilege.'" *Id.* at 312 (quoting *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 630 (Tex. App.SSHouston [1st Dist.] 1984, writ ref'd n.r.e.)). The *Duffy* court also held that references and accusations made by an employer about an employee have a qualified privilege if the remarks are made to a person with an interest in, or a duty regarding, the matter to which the remarks relate. *See id.; see also Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 449 (Tex. App.SSHouston [1st Dist.] 1993, no writ); *ContiCommodity Servs. v. Ragan*, 63 F.3d 438, 442 (5th Cir. 1995) ("Accusations or comments about an employee by his employer, made to a person having an interest or duty in the matter to which the communication

---

[2]    In *Duffy*, we noted that it was an open questionSSone over which the Texas appellate courts had splitSSas  to whether Texas recognizes a cause of action for compelled self-publication defamation. *See* 44 F.3d at 312 n.5.  The appellate case we cited for the proposition that Texas does not recognize such a cause of action is *Doe v. SmithKline Beecham Corp.*, 855 S.W.2d 248, 259 (Tex. App.SSAustin 1993), *aff'd as modified on other grounds sub nom. SmithKline Beecham Clinical Lab. v. Doe*, 903 S.W.2d 347, 350 (Tex. 1995). *See Duffy*, 44 F.3d at 312 n.5.  The Texas Supreme Court granted a writ of error in that case, but the court did not have an opportunity to decide the issue of whether Texas recognizes such a cause of action. *See SmithKline Beecham Clinical Lab.*, 903 S.W.2d at 350 (noting that plaintiff had withdrawn her point of error complaining of summary judgment for defendant on defamation claim).

relates, have a qualified privilege."), *cert. denied*, 1996 WL 26533 (U.S. Mar. 25, 1996).

The qualified privilege protects communications to which it applies unless actual malice is shown. *See id.* Qualified privilege must be pled as an affirmative defense. *See id.* at 443. If that defense is validly asserted by the employer, Texas law places the burden of proving "actual malice" upon the plaintiff. *See id.; Duffy*, 44 F.3d at 314.

"Whether a communication has a qualified privilege is a question of law for the court." *Schauer*, 856 S.W.2d at 449. In this case, the district court concluded that the privilege applied. Reed has not challenged that conclusion.

Under Texas defamation law, "actual malice" does not mean "ill will, spite, or evil motive." *See Ragan*, 63 F.3d at 442; *Duffy*, 44 F.3d at 313. It is a term of art, borrowed from *New York Times v. Sullivan*, 376 U.S. 254 (1964), and its progeny. *See Duffy*, 44 F.3d at 313. In *Duffy*, we determined that the Texas Supreme Court would apply the following definition of actual malice in a compelled self-publication defamation case:

> "Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. 'Reckless disregard' is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' An error in judgment is not enough." *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989) (citations omitted).

7

44 F.3d at 313.[3]

We interpreted this passage as stating that actual malice is "a higher standard than common law malice" and that "only clear and convincing proof will support recovery." *Id.* We also noted that the Texas Supreme Court had extended the *New York Times* test to cases of qualified privilege outside the First Amendment context. *See id.*[4] In any case, because we applied this actual malice standard in *Duffy*, we are bound to do so here as well.


IV.

When reviewing a jury verdict, we apply federal procedural law in determining whether there was sufficient evidence to support the verdict. *See Boeing*, 411 F.2d at 374. We look to state law, however, for "'the kind of evidence that must be produced to support a verdict.'" *Ayres v. Sears, Roebuck & Co.*, 789 F.2d 1173,

---

[3] In *Hagler v. Proctor & Gamble Mfg. Co.*, 884 S.W.2d 771 (Tex. 1994) (per curiam), the court stated its legal standard for actual malice:

> This court has set forth the legal standard for proving actual malice in a defamation case, stating that actual malice is a term of art which is separate and distinct from traditional common law malice. Actual malice in the defamation context does not include ill will, spite or evil motive, but rather requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true.

*Id.* at 771-72 (citation omitted). Although we did not cite to this opinion in *Duffy*, our opinion in *Duffy* is consistent with the legal standard articulated in *Hagler*.

[4] The Supreme Court has expressly held that the states have broadSSbut not unlimitedSSdiscretion to define the scope of a publisher's liability for defamation of a private individual: "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974).

8

1175 (5th Cir. 1986) (quoting *McCandless v. Beech Aircraft Corp.*, 779 F.2d 220, 223 (5th Cir. 1985), *vacated on other grounds on petition for panel reh'g*, 798 F.2d 163 (5th Cir. 1986) (per curiam)). The critical question presented in this case, therefore, is whether Reed presented evidence sufficient to constitute clear and convincing proof that CPL acted with actual malice. *Cf. Duffy*, 44 F.3d at 312–13.[5]

The actual malice analysis is a subjective standard that centers on the state of mind of the person or persons making the allegedly defamatory statements. *See Seidenstein v. National Medical Enters.*, 769 F.2d 1100, 1104 (5th Cir. 1985). In this case, the relevant persons for that inquiry are the people who terminated Reed. At most, this would include Kinnear, Williams, Brown, and Suminski. Any allegedly defamatory statements made by them were entitled to a presumption of good faith and lack of malice. *See Schauer*, 856 S.W.2d at 449.

Reed offered no direct evidence on the state of mind of any of

---

[5] The Supreme Court has expressly approved this synthesis of federal and state legal standards in an analogous context:

> In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages. Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

these individuals. Instead, he argued below that he was not psychologically dysfunctional, that he should have been accorded fictitious "due process" rights, that he was unfairly treated by CPL, and that he was discriminated against on the basis of age. In other words, he misapprehended the legal theory of defamation and failed to present direct evidence on a critical element of a defamation claim brought under Texas law: actual malice.

The key question, in other words, is not whether Reed actually sexually harassed Salgado and Roberts (or engaged in improper conduct toward them), but rather whether Kinnear, Williams, Brown, or Suminski believed that he did. Even if Reed had been able to prove that the allegations of Salgado and Roberts were false, he still could not prevail. The actual malice analysis focuses on the declarant's subjective state of mind, not the objective truth of the declarations; thus, "[p]roof of falsity in fact is not enough, nor is proof of a combination of falsehood and general hostility." *Seidenstein*, 769 F.2d at 1104; *see also Ragan*, 63 F.3d at 443; *Duffy*, 44 F.3d at 314.

The most glaring example of Reed's failure to understand his legal theory occurred during the direct and cross-examinations of Brown. On direct, CPL's counsel asked Brown questions regarding his state of mind during and after his investigation of Reed:

```
Q:   And when you spoke to these Chevron employees [the
     ones Brown interviewed when investigating Reed],
     did you believe them.
A:   Yes.  Yes.
Q:   Was there any doubt in your mind that they were
     telling the truth or telling falsehoods?
A:   No, not at that point in time.
Q:   Did you ever, at any time, think that they were not
```

10

> telling the truth?
>
> A:   No.

On cross, Reed's counsel did nothing to challenge either this specific testimony or the broad proposition that Brown had believed that Reed had engaged in sexual harassment and improper conductSSthe grounds CPL gave Reed as the basis for his termination.

In *Seidenstein*, the plaintiff called as a witness Dr. Egbert, the declarant of the allegedly defamatory statement. *See* 769 F.2d at 1104. On cross examination, the defendant corporation asked Egbert whether he believed the contents of his allegedly defamatory statement. *See id.* Egbert answered affirmatively. *See id.* The plaintiff did not challenge this assertion, "[d]espite the obvious importance to Seidenstein's case of establishing that Egbert did not in fact so believe." *Id.*

Even more astonishing is what occurred when the defense counsel tried to cross-examine one of the plaintiff's witnesses on the issue of Egbert's truthfulness: The plaintiff's counsel objected on the ground that he "'knew of nothing yet that would bring that into issue.'" *Id.* We corrected the impressions of the plaintiff's counsel in no uncertain terms:

> To the contrary, it is difficult to imagine anything more
> fundamentally at issue than Dr. Egbert's truthfulness in
> an action governed, as was this one, by the definitions
> of "actual malice" . . . ;  Dr. Seidenstein can scarcely
> have been expected to prove that Dr. Egbert spoke with
> knowledge that his statement was false or with reckless
> disregard for whether it was false or not without
> questioning Egbert's truthfulness.

*Id.*

11

While Reed correctly argues that the jury could have chosen to disbelieve Brown, it is well-established that "'discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.'" *See id.* at 1105 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)). The Texas courts have specifically held that a jury's belief that a statement was in fact incorrect does not constitute affirmative evidence that the statement's declarant knew that it was false. *See Casso v. Brand*, 776 S.W.2d 551, 558-59 (Tex. 1989) (noting that it was unlikely, although not inconceivable, that such evidence could be uncovered for first time in cross-examination); *Breen v. DeLord*, 723 S.W.2d 166, 170 (Tex. App.SSAustin 1986, no writ).

Reed argues on appeal that the jury could have inferred that the investigation and termination of Reed were based on reasons other than those given to ReedSS*i.e.*, ulterior motives.[6] *Cf. Duffy*, 44 F.3d at 315 n.10 (dictum) (stating only that evidence of ulterior motive could "bolster" an inference of actual malice, not support it independently). Reed argues, in particular, that the jury could have found that he was terminated because of his age and points to the fact that the jury found that his termination had constituted age discrimination.

The district court, however, granted judgment as a matter of law against him on the age discrimination claim after the jury had returned its verdict. The order of final judgment expressly stated that Reed's "proof" of age discrimination consisted entirely of a

---

[6] The jury was not instructed on this ulterior motive theory.

12

mild, conclusionary assertion that he thought age might have been a factor in his hiring. As the district court noted, this was nothing more than "mere refutation." It was certainly not the type of evidence that could clear the "clear and convincing" hurdle. In fact, the district court expressly found that it was not even sufficient to demonstrate, by a preponderance of the evidence, that Reed was a victim of age discrimination committed by CPL.[7] Such evidence, even if believed, could not have met Reed's burden of showing actual malice by clear and convincing proof.

The burden of proving actual malice by clear and convincing evidence is a heavy one: "When the testimony concerning 'actual malice' has conflicted or could plausibly be interpreted either way, we have concluded that the Plaintiff has not met his burden." *National Ass'n of Gov't Employees v. National Fed'n of Fed. Employees*, 844 F.2d 216, 220 (5th Cir. 1988). The evidence that an alleged defamer entertained serious doubts as to the truth of his communication "cannot be found in a record that causes us to entertain [instead] serious doubts as to [the communication's purported] falsity." *Seidenstein*, 769 F.2d at 1105.

In this case, we are faced with precisely this situation. The evidence offered by Reed did not even approach clear and convincing proof of actual malice.

To the contrary, the record causes us seriously to doubt that CPL's stated grounds for termination were anything but true. The

---

[7] Because we hold that Reed failed to prove actual malice, we need not reach CPL's claims contesting some of the district court's evidentiary rulings.

13

record certainly prevents us from seriously entertaining either the notion that Kinnear, Williams, Brown, or Suminski personally disbelieved that Reed had engaged in sexual harassment and improper conduct, or the notion that they had personally disbelieved that Reed was being fired for those reasons.

V.

The district court awarded attorney's fees to Reed of $20,000. CPL appeals the award, arguing that there was no legal basis for it. Reed concedes on appeal that he was not entitled to fees. He did not prevail on his claim under the Age Discrimination in Employment Act ("ADEA") and therefore could not collect fees under that statute.[8] Furthermore, Texas law does not permit the recovery of attorney's fees for tort claims. *See Stine v. Marathon Oil Co.*, 976 F.2d 254, 264 (5th Cir. 1992); TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 1986). The award of attorney's fees must therefore be reversed, as there is no legal basis to support it.

Accordingly, we REVERSE the judgment against CPL on the defamation claim, RENDER judgment for CPL on that claim, and REVERSE the award of attorney's fees.

---

[8] The ADEA, 29 U.S.C. § 626(b) (1985), incorporated the attorney's fees provision of the Fair Labor Standards Act, 29 U.S.C. § 216(b) (Supp. 1995), which authorizes the recovery of attorneys fees only by a plaintiff who secures a judgment. *See* 29 U.S.C. § 626(b); *cf. Falcon v. General Tel. Co.*, 815 F.2d 317, 322 (5th Cir. 1987) (stating that plaintiff in title VII case must demonstrate, as threshold requirement for obtaining attorney's fees, that he was prevailing party).