# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 3, 2008

Charles R. Fulbruge III
Clerk

No. 05-20808

FEDERAL DEPOSIT INSURANCE CORPORATION, As manager of the FSLIC Resolution Fund;

Plaintiff-Appellant

v.

MAXXAM, INC

Intervenor Plaintiff-Appellee

v.

CHARLES E. HURWITZ, et al

Defendants

CHARLES E. HURWITZ;

Defendants-Appellees

FEDERATED DEVELOPMENT CO.

Intervenor Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. H-95-3956

Before HIGGINBOTHAM, GARZA, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case arises from the failure of the United Savings Association of Texas in 1988, estimated to have cost taxpayers $1.6 billion.[1] The Federal Deposit Insurance Corporation sued Charles Hurwitz in federal district court for his alleged involvement in the failure of the large Texas thrift. At the behest of the FDIC, the Office of Thrift Supervision pursued similar allegations against Hurwitz and others in an administrative proceeding that concluded with a holding that the claims were meritless. When the FDIC then moved to dismiss its suit in the district court, the court found that the FDIC's claims were baseless and had an improper purpose of gaining government ownership of approximately 3,800 acres[2] of California redwoods owned by MAXXAM, Inc. ("Maxxam") and harassing Defendants.[3] It assessed large sanctions. The FDIC timely appealed.

I

In 1983, United Financial Group and First American Financial of Texas – two savings and loan companies – merged. UFG became the holding company of USAT, holding 100% of USAT's stock.[4] USAT, with a core business of lending to homeowners, expanded its business as it struggled to stay afloat during the thrift crisis when more than 1,000 thrifts failed throughout the United States.[5] While there was variation among them, all faced a system-wide squeeze in

---

[1] Memorandum from Jack D. Smith, FDIC Deputy General Counsel, and Stephen N. Graham, Associate Director, to the FDIC Board of Directors, at 8 (May 20, 1994).

[2] The acreage estimates for the redwoods (the "Headwaters") differ but are not material. The district court found that it was a 4,400-acre tract. FDIC v. Hurwitz, 384 F. Supp. 2d 1039, 1048 (S.D. Tex. 2005).

[3] Maxxam owned the Headwaters through its Pacific Lumber Company.

[4] This ownership interest triggered a statutory duty to provide sufficient capital to USAT for it to meet its required minimum net worth.

[5] See, e.g., William A. Lovett, Conflicts in American Banking Regulation: Renewed Prudence, Retrenchment, and Struggles Over Growth Potential, 12 ANN. REV. BANKING L. 443, 444 (1993) (describing how "between 1982 and 1992, more than 1500 banks and at least 1000 thrift institutions (mostly S&Ls) failed").

interest rate differentials – between earnings on fixed-interest long-term mortgages and rising market rates. UFG had several substantial stakeholders, including MCO Holdings, Inc., later Maxxam, Inc.,[6] and Federated Development Company. A prominent Texas businessman, Charles Hurwitz, was Chairman and CEO of these two stakeholders as well as the Chairman of UFG, and he owned 52.5% of Federated's shares; Federated in turn owned at least 60% of Maxxam voting stock. By 1984, Federated and Maxxam (then MCO) owned 23.5% of UFG's outstanding shares.[7] Maxxam and Federated applied to acquire up to 35% of the shares of UFG. FHLBB approved the application on the condition that, inter alia, Maxxam and Federated commit to maintaining the net worth of USAT.[8] This net worth commitment arose because by statute, an entity acquiring 25% or more voting power in an insured institution becomes obligated to contribute to the institution's minimum required capital.[9] Maxxam and Federated tried to negotiate changes to the obligation but ultimately declined it,[10] and UFG remained as the guarantor of USAT's minimum capital. In turn,

---

[6] MCO Holdings, Inc. merged with the subsidiary MAXXAM Group, Inc. to form MAXXAM, Inc.

[7] Charles E. Hurwitz's Response to the FDIC's Requests for Admissions, at 45 (item 9.20). As of January 4, 1984, Federated owned 801,941 shares of common stock and Maxxam owned 1,104,098 shares of common stock, or a total of 1,906,039 (23.5%) of the outstanding shares.

[8] The December 6, 1984, resolution required, "For as long as they directly or indirectly control United Savings, applicants shall contribute a pro rata share based on their UFG holdings, of any additional infusion of capital . . . that may become necessary for the insured institution to maintain its net worth at the level required by the Corporation's Net Worth Regulation."

[9] See 12 C.F.R. § 563.18-2 (as revised in 1982).

[10] The FDIC and OTS argued that once the FHLBB issued this obligation, it became binding on the applicants when they later entered transactions that gave them potential control over UFG. They alleged that FHLBB resolutions are not private contracts that require signatures by both parties in order to be binding. The administrative and district courts rejected this theory.

Maxxam and Drexel Burnham Lambert, a company owning stock in UFG, entered into a "call-put" contract.[11] The agreement allowed Maxxam to call UFG's shares held by Drexel, a total of 300,000 outstanding shares.[12] Maxxam indemnified Drexel for the risk of loss associated with the agreement. Through this stock arrangement with a shareholder of UFG – the company that controlled USAT – Maxxam gained at least potential control over USAT,[13] as did Federated, in turn, with its approximate 60% stake in Maxxam and its ownership with Maxxam of nearly 25% of UFG's shares. In other words, Hurwitz owned the majority of Federated's stock, Federated owned a majority of Maxxam, and Maxxam and Federated had a measure of control over UFG and USAT through Maxxam's stock arrangement with Drexel and Maxxam and Federated's combined ownership of UFG shares.[14] An FDIC investigation also

---

[11] The arrangement required MCO to give Drexel a put option if MCO did not exercise the call option for the 300,000 shares.

[12] The FDIC investigation suggested, and its complaint argued, that this was an end-run around Hurwitz's control obligations. The FDIC alleged that the arrangement gave Hurwitz control over additional UFG shares, thus exceeding the 25% threshold.

[13] Whether the "option" constituted ownership of the shares or a mere interest in the shares was disputed. The administrative and district courts concluded that the option was not ownership.

[14] The district court concluded that Hurwitz did not control a "significant percentage" of USAT, contrary to the assertions of the "regulators." Rather, it found that "Hurwitz himself actually owned 0.006% of the holding company's stock. He owned a slight majority of stock in Federated, which owned a majority of Maxxam. Based on his involvement in Federated and Maxxam, Hurwitz's indirect, tertiary personal interest in United Financial was less than 10%. Whether looking at his personal interest in United Financial or Federated and Maxxam's ownership of less than 25% in the company, Hurwitz did not control a 'significant percentage' of it." FDIC v. Hurwitz, 384 F. Supp. 2d 1039, 1055 (S.D. Tex. 2005). This observation is correct, but it fails to address the fact that Hurwitz had control of Federated and Maxxam, which in turn had control of nearly 24% of UFG shares – just below the trigger point for control of USAT, accompanied by the responsibility of maintaining USAT's net worth. In turn, the call-put arrangement for UFG shares potentially allowed Maxxam and Federated to exceed the trigger point through indirect means. It was disputed whether the call option, if exercised, would have required Maxxam to combine its UFG stocks with the Maxxam-Federated stocks and therefore whether the 25% ownership threshold would be triggered by the option.

indicated that in 1985, Maxxam and Federated acquired shares in UFG that, when converted two years later, could give Maxxam and Federated an additional 15% of ownership in Federated. Maxxam and Federated allegedly exchanged these shares for another series of Federated stock to postpone the conversion date and avoid any potential control obligations.[15]

The FDIC investigation also concluded that USAT, Federated, and Maxxam had common management and that Hurwitz participated in UFG's and USAT's Investment Committee meetings and UFG/USAT's joint board meetings. Hurwitz was a member of UFG's Executive Committee and of UFG/USAT's Strategic Planning Committee. USAT's investment manager reported his trade decisions to Hurwitz,[16] and Hurwitz often recommended investment strategies to USAT.[17] An employee of Federated also established USAT's investment department.[18]

The FDIC and OTS focused on two transactions involving Hurwitz as likely contributors to USAT's demise. First, USAT made a real estate loan to a close friend of Hurwitz's, the "Park 410 loan," resulting in a loss of approximately $57 million. Second, USAT, struggling with a changing home lending market, sought additional revenue in mortgage backed securities and junk bonds. These investments were funded by sales of parts of USAT's

---

[15] See infra note 72.

[16] See, e.g., Memoranda from Arthur S. Berner to Charles Hurwitz, Barry Munitz, Jenard Gross, and others, describing, inter alia, potential business decisions such as debt restructuring, acquiring stocks, other entities' willingness to sell back their debt. The memoranda indicate that Hurwitz attended the Management Committee and Strategic Planning Committee meetings at which these decisions were initially discussed.

[17] The minutes of the Investment Committee meetings were not recorded during the meetings.

[18] Brill, Sinex & Stephenson, Hutchinson & Grundy, Report and Litigation Recommendations on Director, Officer, and Professional Liability Claims Arising out of the United Savings Association of Texas Receivership.

business, with financing by Drexel of approximately $1.8 billion of its junk bond acquisitions.[19] This, according to the FDIC, evidenced Hurwitz's indirect control over USAT's investments.

Through United MBS, a USAT subsidiary that Hurwitz helped form, USAT invested nearly $180 million in mortgage backed securities, resulting in losses of nearly $97 million. The FDIC later labeled USAT investments in mortgage backed securities as "Joe's Portfolio," for the USAT junk bond analyst who managed the investments. Rather than unwinding the portfolio when interest rates rapidly fell and more homeowners began prepaying mortgages with the decline in mortgage rates, USAT decided to sell the mortgage backed securities before prepayment and buy other mortgage backed securities in a hasty "roll down" strategy. According to the FDIC, this strategy resulted in very large losses. As USAT's losses increased, the Federal Home Loan Bank Board informed UFG that it must help USAT meet its minimum capital obligation. UFG did not contribute capital. In February 1988 Hurwitz resigned from UFG's Board. FHLBB closed USAT on December 30, 1988, and designated as receiver the Federal Savings and Loan Insurance Corporation in its corporate capacity. With the Federal Institutions Reform, Recovery, and Enforcement Act of 1989, the FDIC succeeded the FLSIC as receiver for USAT.

Working with OTS, which oversees the enforcement of thrifts and the activities underlying their failure, the investigation by the FDIC of USAT's downfall took much of the next six years. To avoid losing potential legal claims, the FDIC entered into several tolling agreements with Hurwitz and others involved in the failure.

---

[19] One memorandum to the FDIC listed "Bonds Underwritten by Drexel for Companies Affiliated with Hurwitz" for 1984 through 1989 based on information gathered from Maxxam Group, Inc.'s Prospectus and 10-K's. See Memorandum from Tom Manick, Adorno & Zeder, P.A., to Robert J. Dehenzel, Jr., FDIC (July 31, 1995).

In 1993 – at least four years after commencing its investigations of Hurwitz's involvement in USAT and two years before suing Hurwitz – the FDIC began to receive communications from environmental groups, and later members of Congress, encouraging it to settle with Hurwitz for his California redwood lands, called the "California Headwaters."  These environmental groups and several government agencies wanted to ensure preservation of the Headwaters.[20]

By a November 17, 1993, memorandum to the FDIC Board of Directors, Jack D. Smith, Deputy General Counsel, and Stephen N. Graham, Associate Director, recommended that the FDIC "file suit by December 31, 1993 for at least $418 million in damages" against individuals involved in USAT's failure, including Hurwitz.  However, the FDIC's lawyers later recommended that it not sue due to hurdles posed by the statute of limitations as well as difficulties in demonstrating Hurwitz's indirect management of USAT through Maxxam's agreement with Drexel.[21]  As the FDIC investigation continued, members of Congress urged the FDIC to proceed, stating,

> We understand that there has still been no formal action initiated to recover the taxpayers' losses in the estimated amount of $1.6 billion resulting from this fifth most expensive savings and loan failure . . . . In light of the continued passage of time without action, we are concerned that the ability to recover these very significant losses is being jeopardized.  Many of the possible targets whose conduct the FDIC has alleged contributed to USAT's failure,

---

[20] See, e.g., Memorandum from Jack D. Smith, Acting General Counsel to Andrew C. Hove, Jr., Acting Chairman (Dec. 21, 1993) ("We are also reviewing a suggestion by 'Earth First' that the FDIC trade its claims against Hurwitz for 3000 acres of redwood forests owned by Pacific Lumber, a subsidiary of Maxxam.").

[21] A July 24, 1995 memorandum from Jack D. Smith and Stephen N. Graham to the Board of Directors expressed concerns that RTC v. Acton, 49 F.3d 1086 (5th Cir. 1995), "further weakened" the FDIC's case because it found that self-dealing and fraudulent conduct were required to toll the statute of limitations for adverse domination suits and that gross negligence was not sufficient.

continue to enjoy vast personal wealth. Justice for the Federal taxpayer requires resolution of this matter.[22]

The chairwoman of the FDIC – Ricki Tigert, later Ricki Helfer – similarly expressed concern regarding the "egregious" actions that may have contributed to the thrift's failure and pushed for legal action against Hurwitz. Following a meeting between two FDIC lawyers and chairwoman Helfer, where she encouraged them "to take another look" at their recommendation not to sue, staff hastily revised their initial memorandum recommending against suit.[23]

The pressure on FDIC regarding the redwoods issue also increased as the end of the tolling agreement neared. On July 24, 1995, Congressmen Pete Stark and George Brown wrote a letter to Helfer asking "the FDIC to pursue the possibility of a debt-for-nature swap which would apply the debt arising from the failure of USAT towards the purchase of the Headwaters Forest."

Persuaded that a parallel administrative proceeding by OTS enhanced its chances at obtaining restitution, the FDIC paid OTS approximately $2.89 million to defray the costs of investigating and prosecuting an administrative enforcement action[24] against Hurwitz, Maxxam, Federated, and others, an arrangement found legal by an internal memorandum.[25] The payment

---

[22] Letter from Representatives George Brown, Esteban Torres, Pete Stark, Lucille Roybal-Allard, Ron Dellums, Nancy Pelosi, Bruce Vento, Elizabeth Furse, Lynn Woolsey, Anthony Beilenson, Tom Lantos, Edward Markey, and Maurice Hinchey to Mrs. Ricki R. Tigert-Helfer, Chair, FDIC Board of Directors (March 30, 1995).

[23] There were "four drafts [of the July 24, 1995 ATS memorandum] that [did] not recommend suit," followed by a July 27 memorandum recommending suit.

[24] A March 23, 1999, resolution of the FDIC Board of Directors authorized "the FDIC to pay OTS up to $3.43 million as reimbursement of the OTS costs associated with the continuation and completion of the administrative proceeding addressing misconduct arising out of the USAT receivership," but it appears that OTS did not request all of the authorized funds.

[25] Memorandum from Carolyn B. Lieberman, Chief Counsel, OTS to Kenneth J. Guido, Jr., Special Enforcement Counsel, FDIC and Bryan T. Veis, Special Counsel (undated). The

responded to OTS advice that it lacked the resources to pursue the action and that any money OTS won in restitution would flow to FDIC as USAT's corporate receiver. Without financial assistance, OTS was unlikely to act.[26] The OTS commenced is official investigation on October 25, 1994, almost a year before the FDIC filed suit.

The FDIC was unsure of whether the OTS investigation would culminate in official administrative proceedings and was concerned that the USAT failure might conclude with no restitution to the FDIC.[27] The FDIC approved its suit at a board meeting where several board members expressed concerns about the difficulties of the case;[28] and when Hurwitz would not agree to further extend the statute of limitations period, the FDIC filed suit against Hurwitz on August 2, 1995. The OTS formally commenced its proceedings on December 26, 1995.[29]

The FDIC declined to sue George Kozmetsky, another senior member of USAT's management, concluding that any claims against him would be barred by the statute of limitations and that a suit against a popular charitable figure

---

district court, on the other hand, believed that the arrangement was illegal, observing, "After an adverse ruling or two from this court, the FDIC illegally paid the Office of Thrift Supervision to bring an administrative action." Hurwitz, 384 F.Supp. 2d at 1047.

[26] Some documents suggest that the FDIC wanted a parallel OTS action to increase the costs of Hurwitz's defense. However, the FDIC twice moved unsuccessfully to stay the district court proceeding to avoid duplicative work. Defendants argue that "the FDIC wanted the OTS case to 'go first' because it preferred" the OTS proceeding to district court.

[27] See, e.g., Testimony of FDIC General Counsel Kroener, stating, "But the Board simply, we had no assurances that anything was going to happen at the OTS, that they would ever bring any charges."

[28] See e-mail from Jack D. Smith to Stephen N. Graham, et al. (July 26, 1995) ("The Chairman and General Counsel have decided to recommend suit in Hurwitz. Therefore, we should distribute a signed ATS by 2:00 tomorrow.").

[29] Notice of Charges and of Hearing for Cease and Desist Order (Dec. 26, 1995).

would be unwise.[30]  Other individuals implicated in the failure with whom the FDIC had renewed tolling agreements also escaped suit.[31]

The original complaint alleged that (1) Hurwitz indirectly maintained control of USAT through the call-put arrangement with Drexel for UFG shares and breached his duty of loyalty to USAT by taking actions that "aggravated USAT's losses and further decreased its net worth," taking "no steps to ensure that UFG did not dissipate its assets or otherwise compromise its obligations to USAT," and by failing to cause other institutions he controlled to infuse net worth into USAT when it dipped below its obligations; (2) Hurwitz, through his involvement with USAT's Board, irresponsibly approved sales and acquisitions of mortgage backed securities for a USAT portfolio despite the knowledge of large losses from the portfolio;[32] and (3) Hurwitz, "active in the affairs of [USAT's] Investment Committee" obtained its approval of a "grossly negligent and reckless gamble" of acquiring "substantial amounts of mortgage backed securities" "financed by reverse repurchase agreements," rejecting "an adequate hedging program in favor of a purely speculative series of bets on interest rate movements."[33]  All claims alleged a breach of Hurwitz's fiduciary duty of loyalty,

---

[30] The district court broadly concluded, on the other hand, that the FDIC declined to sue Kozmetsky because he had no control over redwoods that the Government wished to acquire. Hurwitz, 384 F. Supp. 2d at 1066.

[31] The record shows that the FDIC carefully considered who to sue and not sue.  One memorandum contained a section on "Persons Who Signed Tolling Agreements But Should Not Be Sued" because of, inter alia, their "cooperation," their "relative culpability," and because "they were not closely involved in the gains trading activities."  Memorandum from Robert J. DeHenzel, Professional Liability Section, and Eileen M. Avila, Professional Liability Section, to John F. Bovenzi, Deputy to the Chairman, at 23-24 (Aug. 19, 1992).

[32] The complaint pointed to mark-to-market losses of $122 million as of November 1986 and alleged that USAT and Hurwitz authorized further sales and acquisitions for the portfolio through 1987 despite this knowledge.

[33] The complaint alleged that "[i]n September, Hurwitz was advised that with no change in interest rates USAT would lose $40 to $60 million in each of the next three years," and that "[i]n November, 1986 Gerald Williams advised Hurwitz that USAT's base operation was losing

while claims II and III also alleged that Hurwitz aided and abetted gross negligence.

The FDIC twice moved the district court to stay its case pending completion of the administrative proceeding prosecuted by OTS, urging that a stay would avoid duplicating issues pending in the OTS case. The court found that the "FDIC wanted to stay because it preferred the administrative forum,"[34] advising that it would not "hold[] Mr. Hurwitz up at [the FDIC's] request so [the FDIC] can hit him here while the O.T.S. is doing things to him that I might not let you do here . . . ."[35] The district court at Hurwitz's request also joined OTS as an involuntary plaintiff in the federal suit on November 29, 1996. The Government filed an amended complaint, dropping its claims that related to OTS's administrative proceedings, and the court then dismissed OTS on October 23, 1997.

The Government acquired the Headwaters property in 1999, but by purchase and not as part of any settlement of FDIC or OTS claims. Those claims were not faring well. Five respondents in the OTS case had settled on February 10, 1999, before the administrative court conducted oral hearings in the case, leaving Hurwitz, Maxxam, and Federated as the remaining respondents. The administrative court dismissed the remaining respondents' motion for summary disposition, finding that there were "material facts in issue," including "[w]hether respondents obtained control of UFG"; "[t]he meaning of terms contained in the net worth maintenance provision"; "[w]hether respondents were unjustly enriched, or committed a violation . . . involving a reckless disregard for

---

money at a rate of $77 million per year – up from $40 million per year twelve months earlier."

[34] 384 F. Supp. 2d at 1060 (finding that a memo from FDIC's attorney Williams stating "OTS' case broader bec/not constrained by [Texas's statute of limitations], [business judgment] . . . may be in our [interest] to stay" indicated that the FDIC lied about its motives for the stay).

[35] Hearing Before Lynn H. Hughes at 8 (Nov. 16, 1995).

the law"; and "[w]hether MAXXAM and Federated were holding companies."[36] The court concluded that "these matters can be fairly and responsibly resolved only upon a full evidentiary record of factual and expert testimony."[37] After lengthy hearings held over 119 days, the administrative court on September 12, 2001, recommended dismissal of all remaining claims against Hurwitz, Maxxam, and Federated in a lengthy opinion, finding them meritless. With this collapse of the case, Hurwitz, Maxxam, and Federated settled some of the claims with OTS, agreeing to pay $206,000 and to not participate as a controlling shareholder of any insured financial institution for three years. This agreement also incorporated a

> written release . . . of the OTS, its officers, directors, agents, servants, employees, attorneys and other representatives, but not the FDIC, from all claims and counterclaims that may have been asserted against them arising out of or in any way related to the Respondents, USAT, UFG, Maxxam, or Federated, including, but not limited to the subject matter of the administrative proceeding . . . and in FDIC v. Hurwitz, et al., Civil No. H-95-3956, in the United States District Court for the Southern District of Texas, including all claims and counterclaims against the OTS (as defined in the Release) for costs, fees and sanctions.[38]

The FDIC moved to dismiss with prejudice its suit pending in district court. Hurwitz had counterclaimed, however, arguing that the Government's litigation had been a disguised effort to force a redwoods settlement. He requested sanctions.

---

[36] Id.

[37] Id.

[38] Opinion and Order Accepting Offer of Settlement by MAXXAM, Inc., Federated Development Co. and Charles E. Hurwitz, OTS Order No. AP-2002-2 (Oct. 18, 2002) (emphasis added).

After a two-day hearing in June of 2004, the district court found that the FDIC had acted in bad faith – that its suit was part of a larger government conspiracy to extort the redwoods from Hurwitz. The court found that the Government pursued claims "like Soviet threats;"[39] acted as a "secret society of extortionists;"[40] filed "imaginary claims;"[41] used "slander as legal leverage;"[42] embodied the "progressive," bureaucratic "nightmare on 17th Street;"[43] engaged in a personal vendetta against Hurwitz arising from "bureaucrats' and their like-thinking co-conspirators' appreciation of a successful entrepreneur as the personification of what they opposed in America;"[44] and fought a "political guerrilla war at the behest of interest groups and the administration."[45] The court concluded that the FDIC's employees, attorneys, and chairwoman who testified that the FDIC had a legitimate interest unrelated to the redwoods had all lied.[46] The court also discussed the congressional investigation led by

---

[39] Hurwitz, 384 F. Supp. 2d at 1065.

[40] Id. at 1122.

[41] Id. at 1111.

[42] Id. at 1050.

[43] Id. at 1121.

[44] Id. at 1048.

[45] Id. at 1049.

[46] The district court found, "During his deposition, Jeffrey Williams, the head of professional-liability, swore that 'it was completely fortuitous' that Lambert [an environmental lawyer] was at Hopkins & Sutter [a firm hired by the FDIC for the Hurwitz case]. Williams swore that Lambert's presence in no way influenced the decision to hire the firm . . . Perjury by a lawyer is especially ugly." Id. at 1059. The district court concluded that Williams had perjured himself based on an FDIC interview of the law firm that had noted that Lambert had "[l]umber experience in Washington." Id. The record contains evidence that the FDIC was aware of these connections and that it would benefit from them. An e-mail from Eric J. Splitter to Jack D. Smith of FDIC (Feb. 4, 1994) stated: "My advice from the political perspective is that the 'C' firm is still politically risky. We would catch less political heat for another firm, perhaps one with some environmental connections." It is not clear, however,

13

Congressman Tom DeLay that chastised the FDIC for its involvement in the redwoods issue[47] and a Connecticut district court's criticism of the FDIC's "questionable actions."[48] The court awarded Maxxam more than $72 million in sanctions under Rule 11,[49] for discovery abuses under Fed. R. Civ. Pro. 37,[50] and under the court's "inherent power" to "sanction conduct beyond the reach of other rules."[51] Approximately $58 million of this award was for Maxxam's costs related to the OTS proceeding and other expenses that did not arise in the district court action, and approximately $37 million[52] of the award was for prejudgment interest assessed at an 11% rate,[53] which the court described as a "delay factor."[54] Both parties agree that discovery sanctions are improper here, as they may only be levied against an individual attorney. The FDIC argues that sanctions under Rule 11 and the court's inherent power are also inappropriate.

II

---

whether the FDIC hired Hopkins & Sutter for this reason specifically, or whether Williams was aware of the FDIC's interest in Lambert's environmental expertise. The district court also concluded that "Ricki Helfer lied as much as Williams did," id. at 1103; that FDIC employees used "their agency's authority to compel an illegal result . . . and they lied about it all under oath," id. at 1121; "the FDIC has lied to Charles Hurwitz, the public, and this court," id. at 1049; that the FDIC legal division told Congress "other lies," id. at 1085; that the FDIC lied when it said that "it was merely coordinating or cooperating with the OTS to avoid duplication, confusion, and delays," id. at 1089 (internal quotations omitted); and that in depositions, "witnesses lied, rambled evasively, or testified with the party line," id. at 1100.

[47] Id. at 1086.

[48] Id. at 1118.

[49] Id. at 1109.

[50] Id. at 1110.

[51] Id. at 1110-11.

[52] The actual amount assessed by the district court was $37,011,181.27. Id. at 1119.

[53] Id. at 1118.

[54] Id. at 1119.

The court awarded Defendants $7,182,190.20 in principal and $6,959,876.96 in interest for sanctions that it assessed under the FDIC action. Generally, we apply "an abuse of discretion standard across-the-board to all issues in Rule 11 cases."[55] The questions of whether litigation is frivolous, baseless, or has an "improper purpose" within Rule 11 or under the auspices of a court's broader "inherent power" and whether the court may sanction for this purpose, however, are mixed questions of fact and law.[56] We review the facts underlying the district court's decision to sanction for clear error and "its underlying conclusions of law de novo."[57]

A district court may impose sanctions after a party or parties voluntarily dismiss their claims,[58] as the FDIC did here, since "Rule 11 is designed to punish a party who has already violated the court's rules."[59] Once a limited bar to unsigned pleadings and rarely used by parties,[60] Rule 11 gained bite in an expanded version, requiring that a party, when signing a pleading or any other

---

[55] Thomas v. Capital Sec. Servs., 836 F.2d 866, 871 (5th Cir. 1988); see also Skidmore Energy, Inc. v. KPMG, 455 F.3d 564, 567 (5th Cir. 2006) (quoting Am. Airlines, Inc. v. Allied Pilots Ass'n, 968 F.2d 523, 529 (5th Cir. 1992)) ("'We review all aspects of the district court's decision to invoke Rule 11 and accompanying sanctions under the abuse of discretion standard.'").

[56] See, e.g., Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 399 (1990) ("Determining whether an attorney has violated Rule 11 involves a consideration of three types of issues. The court must consider factual questions regarding the nature of the attorney's prefiling inquiry and the factual basis of the pleading or other paper. Legal issues are raised in considering whether a pleading is 'warranted by existing law or a good faith argument' for changing the law and whether the attorney's conduct violated Rule 11. Finally, the district court must exercise its discretion to tailor an 'appropriate sanction.'").

[57] United States v. City of Jackson, 359 F.3d 727, 731 (5th Cir. 2004).

[58] Willy v. Coastal Corp., 503 U.S. 131, 134 (1992).

[59] Id. at 139 (citing Cooter & Gell, 496 U.S. at 396).

[60] William W. Schwarzer, Sanctions Under the New Federal Rule 11 - A Closer Look, 194 F.R.D. 181, 182-83 (1985) (discussing how Rule 11 "originally provided for the striking of pleadings not signed by an attorney of record or signed with intent to defeat the purpose of the rule").

paper before the court, certify four specific representations: that the party is not filing the paper "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"; its claims or defenses are plausible under existing or potential future law; the allegations are supported by evidence or likely to be supported with further investigation; and that any denials of allegations are so supported.[61]  A violation of any one of these, including filing for an improper purpose, can merit sanctions.  Under the current version, courts may in rare circumstances sanction parties for pleadings like those here that, although having plausible legal theories based in fact, have an underlying improper purpose.  The Rule was amended "precisely because the subjective bad-faith standard was difficult to establish and courts were therefore reluctant to invoke it as a means of imposing sanctions."[62]  As Judge Schwarzer explains in his paper describing the broader version of Rule 11 that emerged in 1983:

> [T]he rule reaches [those pleadings] which, although not without merit, constitute an abuse of legal purpose because brought for an improper purpose such as causing harassment, unnecessary delay or needless increase in the cost of litigation.  As the Advisory Committee Notes state, the rule "should discourage dilatory or abusive tactics and help . . . streamline the litigation process."[63]

We have similarly verified that "[e]ach obligation [of Rule 11] must be satisfied; violation of either justifies sanctions,"[64] and "Subparts (b)(1) and (2) of Rule 11 provide independent bases for sanctions."[65]

---

[61]  Fed. R. Civ. P. 11(b)(1)-(4) (emphasis added).

[62]  Chambers v. NASCO, 501 U.S. 32, 47 n.11 (1991) (citing Advisory Committee's Notes on 1983 Amendment to Rule 11, 28 U.S.C. App., 575-76).

[63]  Schwarzer, 104 F.R.D. at 185.

[64]  Whitehead v. Food Max of Miss., 332 F.3d 796, 802 (5th Cir. 2003).

[65]  Id. at 803 (emphasis added).

The district court based its sanctions on a finding of legally and factually frivolous pleadings in addition to improper purpose. As we will explain, the finding of frivolous pleadings is not supportable.

As for the de facto director claim, the FDIC argues that the court misperceived that claim as a technical corporate de facto director claim, which applies only to individuals' misrepresentations to third parties about their role in a corporation. The FDIC's complaint, although using the term "de facto director," did not rely on this limited doctrine but rather on the broader principle that Hurwitz was not an official director of USAT but exercised substantial control over USAT and violated his fiduciary duties to USAT arising as a result of this indirect control.[66] The FDIC alleged and presented evidence that Hurwitz, instead of obtaining direct control and the associated obligations of that control, used indirect means to influence USAT's investment activities. He participated in board and real estate meetings, helped push along a large real estate loan from USAT to a close friend over the warnings of several state financial institutions, and entered into shareholding agreements with the option

---

[66] The FDIC alleged in its original complaint that Hurwitz "was a de facto senior officer and director and controlling person." This claim could be interpreted as a narrow technical doctrine of de facto director control. But the record and the evidence cited in the FDIC's complaint indicates that the FDIC intended to make a broader claim. One of the FDIC's outside lawyers had warned the FDIC of the possibility that the court would reject a technical de facto argument, stating, "Use of the term de facto director may cause problems down the road" for the very reasons later cited by the district court. Memorandum from Tom Manick, Adorno and Zeder, P.A., to Robert DeHenzel, Jr., FDIC and John Rogers, Hopkins & Sutter (July 31, 1995). The FDIC was likely aware of this warning when writing its pleadings and therefore careful to not rely on that narrow claim. The ATS Memorandum from May 20, 1994, for example, explains in further detail how the FDIC envisioned Hurwitz's involvement under its broader theory of de facto control, stating, "Hurwitz acted as a de facto officer and director of USAT – he was Chairman of UFG, which had virtually no operations independent of USAT, and caused USAT to hold joint USAT/UFG Board meetings, which he attended; he attended certain SLC meetings . . . and selected Investment and Executive Committee meetings; and he was a member of the UFG/USAT Strategic Planning Committee . . . Hurwitz devised and approved USAT business strategies. He worked with other MCO/FDC employees to direct USAT's securities investments."

to obtain a substantial percentage of USAT's shares.[67] Specifically, the original complaint alleged,

> He was the Chairman of the Board and Chief Executive Officer of UFG, MCO [Maxxam] and Federated. He also served as UFG's President and was a member of UFG's Executive Committee and the UFG/USAT Strategic Planning Committee. Hurwitz was also a de facto director and senior officer of USAT and voluntarily assumed the responsibilities of an officer and director of the institution. He functioned as an active member of the USAT Board, if not its de facto chairman. He directed and controlled USAT's investment activity; he regularly attended Board and Committee meetings; he selected USAT officers and directors; he controlled and dominated virtually all of USAT's activities. No significant decision concerning USAT's affairs was undertaken without his approval.[68]

As FDIC attorneys then stated, this claim had a legitimate basis in law[69] and had evidentiary support.[70]

The claim regarding Hurwitz's involvement in mismanaging the mortgage backed securities portfolio and other mortgage backed securities decisions were

---

[67] The district court found that Hurwitz could not have obtained more than 25% of UFG's shares because it disagreed with the FDIC's view of the call-put arrangement, stating, "The FDIC distorted the 1985 Drexel option to make its claim. The parties agree that Maxxam had an option to buy United Financial stock from Drexel. Only if the option to buy stock were the same as having bought stock would Maxxam -- and therefore indirectly Federated -- have owned more than 25% of United Financial's stock. The FDIC said that (1) having the option was the same as owning the stock and (2) the option gave Maxxam -- and therefore Federated -- more than 25% of United Financial, triggering the net-worth obligation -- the one that they had rejected." Hurwitz, 384 F. Supp. 2d at 1077. The fact remains, however, that Federated and Maxxam owned nearly 25% of UFG's stock, and the call-put arrangement would have allowed Maxxam to gain up to 9.7% of its stocks, therefore triggering the net worth obligations associated with 25% ownership. The FDIC also provided other evidence of Hurwitz's indirect venues of control, such as his involvement in USAT meetings and investment decisions.

[68] Original Complaint and Jury Demand at 5.

[69] FDIC lawyers stated in the 1994 ATS Memorandum: "Under Texas law, secondary liability theories, such as knowing participation in or aiding and abetting breach of fiduciary duty, can be used to reach the activities of culpable persons, like Hurwitz or Rosenberg, who were neither officers nor directors of USAT . . . Hurwitz should be sued for his knowing participation in breaches of fiduciary duty by the officer and director defendants."

[70] See supra note 66; infra note 71.

similarly challenging – as it was likely to invoke the business judgment rule – but the FDIC alleged that USAT's investment staff reported their decisions to Hurwitz and that Hurwitz influenced some of USAT's major investment decisions through his involvement. These allegations had evidentiary support.[71]

Finally, the FDIC argued that Hurwitz, because of his substantial control over USAT, had a fiduciary duty to cause his company, UFG, and others with control over USAT to infuse net worth into USAT when it was failing. This claim also had evidentiary support.[72] The FDIC's claims, although creative in

---

[71] A 1988 FDIC document stated, "The controlling shareholder of United through its holding company is Charles Hurwitz . . . He is currently the object of a congressional investigation to determine whether SEC violations have occurred . . . United has been scrutinized as a possible source of funds for Hurwitz's outside activities. Evidence is currently inconclusive." Memorandum from Neil Twomey, Supervisory Agent, to Ginger Baugh, Regulatory Analyst (May 5, 1988). Other evidence establishes stronger support for the FDIC's claims of Hurwitz's broad influence in USAT and its controlling institutions. A confidential memorandum to Charles Hurwitz, Barry Munitz, Jenard Gross, and Mike Crow from Arthur S. Berner (Nov. 18, 1987) reports on a meeting with Neil Twomey and discusses how "United will be going below its minimum regulatory net worth either during 1987 or early 1988 . . . as a result of all these [points considered in the discussion] I believe that we should begin to gear up for taking on additional operating burdens during 1988." In this meeting, Berner and Twomey referred to (albeit positively) Hurwitz as one of the "smart business people running Texas thrifts . . . ." (emphasis added); Board meeting minutes indicated that Maxxam made investment presentations to the Board.

[72] See, e.g., supra note 71 (memo to Hurwitz indicating that USAT would drop below its net worth); Charles E. Hurwitz's Response to the FDIC's Requests for Admissions, at 39 (item 8.2) (Hurwitz stipulated to the fact that when FHLBB approved UFG's acquisition of USAT, it required UFG to cause USAT's net worth to meet the required minimum in 563.13(b) of the Rules and Regulations for Insurance of Accounts); a November 17, 1993 ATS memorandum suggested several venues through which Hurwitz may have indirectly owned and/or controlled more than 25% of UFG, including the call-put arrangement with Drexel and UFG's 1985 issuance of 750,000 shares to Maxxam and Federated. These Series C preferred shares were convertible into two shares of UFG common stock (approximately 15% of UFG) after June 15, 1987. This might have pushed Maxxam and Federated's ownership over the 25% threshold and triggered net worth obligations because Maxxam and Federated already owned more than 23% of UFG's stock. Maxxam and Federated "exchanged the Series C preferred [shares] for Series D, which postponed the date of conversion" and allowed them to avoid having unauthorized control of a savings and loan institution. An early investigation memorandum from Ginger Baugh to Neil Twomey and Danny Thomas concluded, "It has been determined that if MCO [Maxxam] and Federated (1) increase their ownership to 35% of UFG common stock, (2) convert all of their preferred stock to common stock, and (3) exercize [sic] the call option for 300,000 shares of UFG common stock, then MCO and Federated will have a combined ownership of UFG of 46.8%." Memorandum from Ginger Baugh to Neil Twomey and

that they targeted an individual who was not officially part of USAT's directorship, were a plausible if not ultimately sustainable attack upon an unusual business arrangement, which, the theory posited, allowed Hurwitz to avoid obligations of official control while maintaining practical control over that thrift. As in FDIC v. Calhoun, "while the FDIC's claim was doomed after the court made its factual findings, the FDIC's pleading was at least colorable at the time of the signing of the first amended complaint."[73] The FDIC knew that its claims faced an uphill battle, particularly in the Fifth Circuit, but it was also aware of $1.6 billion in losses to the public as a result of the thrift's failure, and the evidence suggested that Hurwitz may have contributed to these losses. The FDIC's claims had a logical theory for Hurwitz's involvement in the failure and met the minium threshold required for Rule 11's pleadings. We must conclude that the district court was clearly erroneous in its factual findings and erred in its legal conclusions supporting Rule 11 sanctions for factually baseless and frivolous pleadings, as it determined that "[t]he FDIC was unable to define its legal theories or its factual support, much less connect the two."[74] We turn then

---

Danny Thomas (Sept. 3, 1987).

[73] 34 F.3d 1291, 1299 (5th Cir. 1994).

[74] 384 F. Supp. 2d at 1109. The court overstated the implications of at least one document supporting this conclusion. The court found, " Despite a learned opinion from its private counsel that it had no viable claim against Hurwitz and the others, the FDIC sued here and later illegally hired the Office of Thrift Supervision to bring identical, baseless claims." Id. at 1048 (emphasis added). A report from Brill, Sinex & Stephenson and Hutcheson & Grundy did conclude that "we cannot estimate the probability of success at being greater than 50% on liability and damages." But that report also found, in relevant part, "We did find evidence that Charles Hurwitz may have used USAT in connection with insider trading or stock manipulation, and those findings have been turned over to the appropriate task force in Washington. Specifically, our review disclosed evidence of acts and omissions which could form the basis of negligence, breach of fiduciary duty, or fraud claims . . . . To the extent it is acknowledged at all, the officers and directors justify their willingness to consult with Hurwitz on the basis of Hurwitz's expertise in the securities area and his status as the ultimate controlling shareholder . . . our review disclosed that the officers and directors approved transactions designed to defeat or evade safety and soundness regulations." The report concluded that "Hurwitz is an affiliated person, a control person, or the alter ego of USAT and/or UFGI, and thus is liable for gross negligence and breaches of fiduciary duty . . . and that

to the issue of improper purpose, an issue not resolved by the conclusion that the FDIC's claims were not frivolous or baseless.

The court's discretion to impose sanctions for an improper purpose under Rule 11 and its inherent power is bounded. "[G]enerally, district courts do not sanction attorneys who make nonfrivolous representations. . . . [They] may do so, however, where it is objectively ascertainable that an attorney submitted a paper to the court for an improper purpose."[75] Furthermore, "[a]lthough a district court is not to read an ulterior motive into a document 'well grounded in fact and law', it may do so in exceptional cases . . . where the improper purpose is objectively ascertainable."[76] "[I]n determining compliance vel non with each obligation [of Rule 11], 'the standard under which an attorney is measured is an objective, not subjective, standard of reasonableness under the circumstances.'"[77] Our emphasis on an objective inquiry has been emphatic; we have expressly rejected any subjective inquiries into the motivation behind a filing, explaining,

> The history of the Rule . . . indicates that "subjective bad faith" is no longer an element in Rule 11 inquiries. Instead, the court must focus on objectively ascertainable circumstances that support an inference that a filing harassed the defendant or caused unnecessary delay. . . . [P]urely subjective elements should not be reintroduced into the determination concerning "improper purpose."[78]

---

he engaged in a conspiracy to defraud the institution." Report and Litigation Recommendations on Director, Officer and Professional Liability Claims Arising out of the United Savings Association of Texas Receivership at 14-17, 36 (undated).

[75] Whitehead, 332 F.3d at 805 (citations omitted).

[76] Id. (citing Sheets v. Yamaha Motors Corp., U.S.A., 891 F.2d 533, 537-38 (5th Cir. 1990)) (emphasis added).

[77] Id. at 802 (quoting Childs v. State Farm Mut. Auto. Ins. Co., 29 F.3d 1018, 1024 (5th Cir.1994)).

[78] Nat'l Ass'n of Gov't Employees, Inc. v. Nat'l Fed'n of Fed. Employees, 844 F.2d 216, 224 (5th Cir. 1988).

Doubtless many plaintiffs have multiple purposes in pursuing litigation. And so long as the merits of their claim, viewed objectively, are supported by a good-faith belief that the allegations are well founded and not frivolous, the subjective motivation for pursuing the claim and the multiple purposes are ordinarily of no moment.[79] As the Supreme Court held in Hartman v. Moore, "It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."[80]

A federal agency plays by the same rules as private litigants, albeit with strictures upon its litigation goals located in its statutory authority – its mission. Within the broad compass of their statutory missions, federal agencies are no different than private litigants. As creatures of Congress with broadly-stated mandates, many of the agencies, including the FDIC, make law, enforce law, and often resolve disputes. In discharging these duties, federal agencies are, as a part of our governance, rightfully mindful of "political views" attending their decision.[81] It follows that any finding that this litigation was pursued for an "improper" purpose must find footing in this soft matrix. An "improper" purpose connotes a purpose defying a normative standard.

Hurwitz maintains that Congress gave neither the FDIC nor the OTS authority to protect the Headwaters, however much in the public interest it may be. This location of normative footing sees "improper" as exceeding statutory authority. As a simple challenge to the "power" of the FDIC or the OTS to

---

[79] We recognize the difficulty in identifying an "improper purpose" objectively, as an "improper purpose" connotes intent. However, we have consistently emphasized that we must follow an objective inquiry. See, e.g., Whitehead, 332 F.3d at 802; Nat'l Ass'n of Gov't Employees, Inc., 844 F.2d at 224.

[80] 547 U.S. 250, 260 (2006).

[81] See, e.g., In re FDIC, 58 F.3d 1055, 1062 (5th Cir. 1995) ("the fact that agency heads considered the preferences (even political ones) of other government officials concerning how . . . discretion should be exercised does not establish the required degree of bad faith or improper behavior").

regulate redwoods, its effort to regulate these privately owned lands is "improper," and brought with that single-minded purpose would be illegal;[82] persisting in that effort would be sanctionable by the court, likely under Rule 11 as baseless. The FDIC could not, for example, itself conduct a criminal prosecution of Hurwitz – it would have to recommend to the DOJ that it do so. But the FDIC and OTS cannot fairly be said to have acted with the single purpose of redwoods acquisition, and any such finding of fact by the district court is clearly erroneous.[83]

---

[82] See, e.g., In re Kuntsler, 914 F.2d 505, 520 (4th Cir. 1990) (where there is "no proper purpose for appellants' filing suit," a court's delving into evidence of the improper purpose and issuing sanctions is acceptable (emphasis added)). That court, however, also affirmed that the case was not well grounded in law and that "a district court should consider the first two prongs of Rule 11 before making a determination of improper purpose." Id. at 518.

[83] The district court found, for example, "The agency wanted to placate environmentalists and politicians, not redress the failure of the thrift." Hurwitz, 384 F. Supp. 2d at 1111. The Government provides concrete examples of errors in the court's factfinding. The court found, relying upon the notes of an FDIC staff attorney, that FDIC General Counsel Kroener met with Vice President Gore to discuss the redwoods. Id. at 1080. Kroener testified that the notes were not his and that Gore was not at the meeting (responding "Correct" to Attorney Nickens's question that, "you indicated that no meeting with Vice Present Gore actually occurred. Correct?"). The court also cited to FDIC notes that, according to the court, stated, "we have no claim against Kozmetsky that can survive stat. of limitations." Id. at 1065. The court viewed these notes as showing that if the FDIC had brought the case for any reasons other than the redwoods, it would also have sued Kozmetsky and that "[t]his was a concession from its [the FDIC's] earlier position that George Kozmetsky needed to be sued because he was a member of the 'Hurwitz' core group.'" Id. These notes were in fact a summary of statements made by opposing counsel, not by the FDIC. The notes state, "They [Kozmetsky's counsel] want to bring Kozmetsky to closure – They said that . . . we have no claim against Kozmetsky that can survive stat. of limitations." The FDIC staff who were deposed repeatedly insisted that the debt-for-nature swap was not the reason for their suit. Kroener, for example, stated that "there were a number of communications between the FDIC staff and the Hill with respect to our claims against Mr. Hurwitz. And there were a number of suggestions made by Congressmen and by environmental groups with respect to the claims we might make directly against the trees, a constructive trust, all sorts of things. And the staff looked at those, explored those, in the course of its investigation. And that ultimately the corporation brought a different suit and those were not a factor." When Nickens asked Williams, "Does it remain your testimony that the debt for nature idea as advanced by the Rose Foundation and others had no effect on the decision to sue Mr. Hurwitz?" Williams responded, "Absolutely so."

That said, a finding that acquiring the Headwaters was one of the purposes of the FDIC and OTS's prosecution would not be clearly erroneous. So we are left to either conclude that a valid purpose – within the compass of its statutory charge and adequately grounded in fact and law, viewed objectively, leaves the improper purpose irrelevant – at least so long as the litigation would have been pursued by the government agencies with no redwood acquisition in the picture, or that by some measure, acquiring the Headwaters was a dominant purpose. Yet determining improper purpose by the strength of the various motivations – proper and improper – in bringing suit would lead us too far into the territory of subjective inquiry.

We shy from inquiry into the "motivation" of Congress and are wary of searching its proceedings for it, looking instead to language of statutory text. Much of the focus on the primary use of text in learning congressional purpose rests on the hazards of any other course. But agencies are not the Congress and searching inquiry into the purpose of acts by large corporate bodies is daily fodder in the courts. There are strong arguments that for kindred reasons judicial inquiry ought to end at the conclusion that while there were multiple purposes, at least one of which was the "improper" purpose of acquiring the redwoods, the litigation would have been pursued, the redwoods aside. Locating purposes is a difficult task itself, but gauging the substantiality of one over the other beyond the sine qua non inquiry pursues an abstraction – an evil thought that animated no act.[84]

To be more specific: The agencies were well within their statutory mission in seeking money damages from Hurwitz. If this effort would have been made, again, redwoods aside, accepting trees for dollars alone would be unusual but not functionally different in result from a government purchase of the redwoods and

---

[84] See, e.g., Schwarzer, 104 F.R.D. at 196 ("Were a court to entertain inquiries into subjective bad faith, it would invite a number of potentially harmful consequences, such as generating satellite litigation, inhibiting speech and chilling advocacy.").

a cash settlement of the Government's suit against Hurwitz. Indeed, the FDIC made it clear that if it participated in a redwoods settlement, it would still insist upon cash to restore taxpayer coffers. The pressure upon Hurwitz to deal the Headwaters generated by the litigation and desired by some has no independent meaning if the suit would have been pursued without that possibility.

The analogous test in Hartman shows both the logic and the necessary role of a sine qua non standard for purpose-based inquiries. Hartman required that an individual claiming retaliatory prosecution show that the Postal Service and the government prosecutor lacked probable cause in bringing a claim against him[85] – that the "prosecution would not have occurred but for the officials' retaliatory animus."[86] While the Government may have had illegitimate reasons for prosecuting someone who lobbied against its policies, the plaintiff had to allege and show a lack of legitimate reasons to prove retaliatory behavior on the Government's part.[87] Without this requirement, the causal connection between animus and initiation of legal action would be vague, creating a lower bar of proof and violating the "presumption that a prosecutor has legitimate grounds for the action he takes."[88] We apply a similar standard to sanctions assessed for an improper purpose: while the presence of probable cause weakens the relevance of other bad motives in a malicious prosecution case, a good faith basis for bringing suit is proof of a proper purpose and increases the difficulty of proving that the suit would not have been filed but for an improper purpose. As we will explain, insisting that a claim of improper purpose in the prosecuting of a claim contain an element of causation – that the claim would not otherwise

---

[85] 547 U.S. at 1704.

[86] Id. at 1704 n.7

[87] Id. at 1706 ("The connection, to be alleged and shown, is the absence of probable cause.").

[88] Id.

have been pursued – in no way undermines this court's insistence that improper purpose is an independent requirement of Rule 11. It rather insists that an improper purpose cannot stand on its own if it lacks this but-for causative force.

Having rejected a balancing inquiry into the relative strength of improper and proper motivations behind the filing of a suit, the resulting questions are whether 1) the suit at the outset would have been pursued sine qua non, and 2) whether the methods and manner of prosecuting the claim after the initial filing was to impose unnecessary costs of defense upon Hurwitz. If the invalid purpose, within a mix of other proper purposes, manifests itself in the continuing of litigation for the objectively ascertainable purposes of harassment or delay, sanctions are warranted under the plain text of the Rule or simply under a court's inherent power to control the proceedings before it. Pursuit of the Headwaters would not be an independent tainting factor. Rather, it would be evidence to be coupled with evidence that the case (while not sanctionable for filing) did not pose a threat of liability sufficient to bring Hurwitz to the bargaining table, at least one with the Headwaters in play – that this want of strength was met by prosecuting the claims in a manner calculated to impose high costs.[89] In other words, the FDIC would violate Rule 11 if it filed a case that it reasonably thought had merit, but pursued it in a manner calculated to increase the costs of defense, and it is here where the able district court's findings of improper purpose, grounded in needless harassment and delay, find accord with the Rule. Although the case had sufficient merit to surpass the bar of non-frivolous factual and legal pleading as well as a proper purpose for filing suit, the court recognized that as the case proceeded, the FDIC began to exert

---

[89] See, e.g., Davis v. Veslan Enters., 765 F.2d 494, 500 (5th Cir. 1985) (affirming Rule 11 sanctions for improper purpose where a party brought a removal petition solely to delay the judgment in a case); Morley v. CIBA-Giegy Corp., 66 F.3d 21, 25 (2d Cir. 1995) (holding that filing a supplemental complaint to "intimidate the defendant into a large settlement" was an improper purpose, while also finding other Rule 11 violations (internal quotations omitted)); see also Georgene M. Vairo, Rule 11 Sanctions: Case Law, Perspectives and Preventive Measures 262-63 (2004) (discussing these cases and others).

other pressures upon realizing that sheer exposure to liability might be insufficient to force negotiation. As we found in National Association of Government Employees v. National Federation of Federal Employees,

> we do not hold that the filing of a paper for an improper purpose is immunized from Rule 11 sanctions simply because it is well grounded in fact and law. The case can be made, for example . . . that the filing of excessive motions, even if each is "well grounded," may under some circumstances constitute "harassment" sanctionable under the Rule.[90]

Litigation calculated to harass or increase costs warrants sanctions, the merits of the case notwithstanding.

Where we have upheld sanctions for "improper purpose," our analysis has followed a similar path. In Whitehead v. Food Max, we upheld Rule 11 sanctions when a party filed a paper with "an improper purpose,"[91] finding improper purpose to be the sole motivating factor of the filing – no mix of improper and proper purposes could be divined. The sanctioned party "did not dispute" that the purpose behind his actions, deemed improper by the district court, was "to embarrass" the defendant and to "seek[] personal recognition."[92] In so doing, as we have discussed, we recognized that "[a]lthough a district court is not to read an ulterior motive into a document 'well grounded in fact and law,' it may do so in exceptional cases . . . where the improper purpose is objectively ascertainable."[93] In ascertaining this purpose, we implied that the sanctioned party would not have acted as he did in the absence of the improper purpose. Entering a Kmart store with two marshals and demanding money was not for the proper purpose of collecting the sanctioned party's judgment, as the cash in

---

[90] 844 F.2d at 224.

[91] 332 F.3d at 805 (emphasis added).

[92] Id. at 807.

[93] Id. at 806.

27

Kmart's registers offered little toward a $3.4 million judgment; and "the execution was unnecessary to secure the judgment," as the judgment imposed a lien against Kmart's property.[94] Nor did the sanctioned party act with the arguably proper purpose of leveraging settlement, as he had only requested settlement in one letter, and there was no indication that Kmart had avoided settlement communication.[95] In other words, the sanctioned party would not have pursued the actions in dispute but for his improper purpose of embarrassing Kmart and bringing public attention to himself.

In National Association of Government Employees, we also alluded to a sine qua non-type inquiry in holding, "'If a reasonably clear legal justification can be shown for the filing of the paper in question, no improper purpose can be found and sanctions are inappropriate.'"[96] We emphasized:

> Rule 11 focuses on an attorney's obligation "at the time a 'pleading, motion, or other paper' is signed," and sanctions "should not amount to an 'accumulation of all perceived misconduct, from filing through trial,' resulting in a 'single post-judgment retribution in the form of a massive sanctions award.'" Rule 11, therefore does not permit the imposition of sanctions simply for bringing a meritless lawsuit . . . .[97]

In Sheets v. Yamaha Motor Corp. we made a similar inquiry. We found that one potentially illegitimate purpose was "certainly not adequate to overcome the defendants' legitimate interest"[98] and held that the district court

---

[94] Id.

[95] Id.

[96] 844 F.2d at 224 (quoting Schwarzer, 104 F.R.D. at 181).

[97] Id. at 222 (quoting Thomas v. Capital Security Servs., Inc., 836 F.2d 866, 874, 881 (5th Cir. 1988) (en banc)).

[98] 891 F.2d 533, 538 (5th Cir. 1990).

abused its discretion in imposing sanctions for an improper purpose under Rule 11.[99]

Where an improper purpose was not necessarily the "but for" cause of a party's decision to file, the Supreme Court has upheld sanctions for a party's bad faith manner of pursuing the case. In Chambers, the defendant "attempted, by . . . tactics of delay, oppression, harassment and massive expense to reduce plaintiff to exhausted compliance."[100] We have similarly held. In Natural Gas Pipeline Co. v. Energy Gathering, the party's "evasiveness and intransigence" in disobeying court orders "justified sanctions" under a court's inherent power.[101]

In asking whether a party pursued an illegitimate purpose to increase costs or to harass a party – regardless of the weight of that purpose in filing suit – we have determined that we must identify "'unusual circumstances'" that show such purposes.[102] In so doing, we look to "objectively ascertainable circumstances rather than subjective intent,"[103] one example of which is excessive filing.[104]

Hurwitz failed to prove that the agencies would not reasonably have pursued this case even in the absence of the redwoods issue and any implicit similar finding by the district court is in error – whether measured by the clearly erroneous, abuse of discretion, or do novo error standards. The FDIC was under pressure from Congress to prosecute one of the largest savings and loan failures of that period, and Chairwoman Helfer expressed concern regarding the "egregious" nature of the failure and individuals' involvement in that failure. An

---

[99] Id.

[100] 501 U.S. at 41 (internal quotations omitted); see also id. at 56 n.20 ("Chambers' bad faith conduct in the course of the litigation caused the delay for which damages were sought").

[101] Natural Gas Pipeline Co. v. Energy Gathering, 2 F.3d 1397, 1410 (5th Cir. 1993).

[102] Calhoun, 34 F.3d at 1300 (quoting Sheets, 891 F.2d at 538).

[103] Sheets, 891 F.2d at 538.

[104] Id. (citing Nat'l Assoc. of Gov't Employees, 844 F.2d at 224).

early memorandum – authored long before the much-discussed board meeting eventually recommending suit – itself recommended that the FDIC pursue claims against Hurwitz and other FDIC directors. This also occurred before the bulk of the outside pressure on the FDIC to get involved in a redwoods settlement. A later memorandum recommended against suit – not because the attorneys believed the claims were without merit, an abandonment of its earlier view, but rather due to then-recent Fifth Circuit and Texas decisions on the fraud or self-dealing necessary to toll the statute of limitations, raising a potential bar to many of the FDIC's claims. The attachment introducing the memorandum recognized that other case law developments "further weakened the viability" of claims. It also recognized that a decision not to sue "is likely to attract media coverage and considerable criticism from environmental groups and Congress . . . We plan to pursue . . . settlement discussions [regarding the debt-for-nature swap suggested by the Department of the Interior] in the coming weeks."[105] Notably, the introductory memorandum specifically disconnected the possibility of settlement from the suit. After discussing the settlement options, it moved back to its summary of the prospects for a successful suit, stating, "It [the ATS memo recommending against suit] should be considered for Board approval only if the board decides, as a matter of public policy, that it wants the Texas courts to decide the statute of limitations and standard of care issues rather than FDIC staff."[106]

The revised Authority to Sue (ATS) memo, which recommended suit, recognized the high risk of the litigation but wrestled with the alleged mismanagement that had contributed to USAT's failure. The introduction to the memo stated:

---

[105] Memorandum from Jack D. Smith, Deputy General Counsel and Stephen N. Graham, Associate Director (Operations) to Board of Directors, FDIC at 4 (July 24, 1995).

[106] Id.

In our view, Hurwitz and other proposed defendants were grossly negligent. However, we also estimate a 70% probability that most or all of the conventional claims that could be made in the FDIC's case would be dismissed on statute of limitations grounds. Hurwitz's failure to cause compliance with the NWM [net worth maintenance] agreements has a better probability on the statute of limitations issue, but there are numerous obstacles to successful prosecution of that claim. Nonetheless, we believe the litigation risks are worth taking because of the egregious character of the underlying behavior in this case which caused enormous losses, and to further our ongoing efforts to shape the law evolving in this area.[107]

We must conclude that a finding that the FDIC would not have brought suit absent the redwoods issue is against the great weight of the evidence. The district court's findings, that the FDIC "suit was about the redwoods – not compensating the taxpayers for United Saving's failure through Hurwitz's legal obligations;"[108] that "[t]he record shows that the swap was the only reason for this suit"[109]; and that "[t]he FDIC's improper purpose in suing Hurwitz is objectively ascertainable. . . . [and that] the agency wanted to placate environmentalists and politicians, not redress the failure of the thrift," are clearly erroneous.[110]

Despite the lack of an improper purpose as the "but for" motivation behind the suit, we affirm the district court's finding of improper purpose because its finding that the FDIC pursued the litigation with redwoods in mind and with a motivation of increasing the costs of litigation and forcing settlement was not clearly erroneous. The court found, for example, that the FDIC "did not admit

---

[107] Memorandum from Jack D. Smith, Deputy General Counsel and Stephen N. Graham, Associate Director (Operations) to Board of Directors, FDIC at 2 (July 27, 1995).

[108] Hurwitz, 384 F. Supp. 2d at 1080.

[109] Id. at 1108 (emphasis added).

[110] Id. at 1111.

that it was withholding documents" initially, delayed producing a privilege log, failed to identify many documents and disclosures that it kept in a warehouse, and "impeded the depositions of its officials."[111] Indeed, there is evidence in the record showing that the FDIC engaged in various strategies in several fora to "pressure" Defendants. Not all of these strategies attempted to pressure Defendants improperly, but some did.

In a July 15, 1994 memorandum, the FDIC's lawyers wrote,

> At the most recent "summit" meeting between FDIC and the target defendants and their counsel, . . . Hurwitz's attorney made an impassioned argument that FDIC had not done a thorough job investigating the proposed claims . . . These probative (albeit we believe exaggerated) remarks were the genesis of the idea to defer submission of the ATS memo to FDIC's Board for some extended period . . . Given this background, it is essential that we keep the "pressure" on defendants to make, in a timely fashion, their submissions and to identify witnesses who supposedly have relevant information [regarding the unsubstantiated nature of the claims].[112]

The FDIC's attorneys explained later in the memorandum that dual actions by the FDIC and OTS would be effective because "OTS can avoid some of the adverse Texas precedent" and its "reach is broader and the standards for liability less." They concluded that "having the defendants confront two agencies in different venues adds significant pressure."[113] They made no mention of pressure to settle for the redwoods, however. Other communications indicated that groups lobbying the FDIC wanted Hurwitz to "feel some pain by giving FDIC some Headwaters forest"[114] in a possible debt-for-nature settlement, but

---

[111] Id. at 1096-97, 1100.

[112] Memorandum from Robert W. Patterson, John L. Rogers, and F. Thomas Hecht, FDIC Attorneys, to Jeff Williams, FDIC Head of Professional-Liability, at 3-4 (July 15, 1994).

[113] Id. at 24.

[114] E-mail forwarded to William F. Kroener, III, et al. with Comments by Jack D. Smith (Sept. 6, 1996).

the FDIC itself did not make this statement. Soon after FDIC had filed suit, FDIC attorneys demonstrated their opposition to any involvement in the redwoods matter, stating,

> On August 2, 1995, the FDIC sued Charles Hurwitz . . . Yesterday the Rose Foundation . . . wrote urging the FDIC/OTS/DOJ to act immediately to block logging in the Headwaters Forest . . . The Legal Division does not believe the FDIC or OTS should intervene in the logging matters for the following reasons . . . MAXXAM is not a defendant in the FDIC suit . . . neither the FDIC nor OTS could demonstrate to any court that [logging in Headwaters] compromises any contingent interest the FDIC or OTS might have . . . neither the owner of the asset, Pacific Lumber, nor even its owner, MAXXAM, is being sued by the FDIC.[115]

There is also evidence that Chairwoman Helfer opposed FDIC involvement in the redwoods. In a September 19, 1995, letter to the Rose Foundation, an environmental group, she wrote,

> I understand and appreciate the interest in a debt-for-nature swap and other relief to preserve the Headwaters Forest. Neither Maxxam nor Pacific Lumber Company, however, are defendants in the FDIC's lawsuit . . . While Mr. Hurwitz, through his significant stock ownership in Maxxam, may be in a position to influence . . . a debt-for-nature swap, our recently filed lawsuit against Mr. Hurwitz does not provide a legal basis for compelling that result.

Chairwoman Helfer wrote a nearly identical letter to Congressman David E. Skaggs on October 2, 1995, and to at least four other members of Congress on September 28, 1995.[116]

But there is evidence that the FDIC saw the litigation and a related administrative forum both as a discharge of its statutory duty and as an opportunity to pressure settlement for redwoods by increasing costs and

---

[115] Memorandum from William F. Kroener, II, General Counsel, FDIC to Chairman Helfer, FDIC (Sept. 12, 1995) (MAXXAM became a party at a later point).

[116] Chairwoman Helfer sent these letters to Lucille Roybal-Allard, Zoe Lofgren, George E. Brown, Jr., and Pete Stark.

harassing Hurwitz through continued litigation, despite opposition from several of its lawyers. Jeff Williams of the FDIC e-mailed Jack Smith (also with the FDIC) on April 3, 1995, about a meeting with the Department of Defense, describing "our brief discussion [with DOD] on Charles Hurwitz and exploring creative options that may induce a settlement involving the sequoia redwoods in the FDIC/OTS case."[117] Although this only relayed the communication of another agency and the "creative options" discussed involved base closure and land swap options – not harassment through lawsuits – it shows that the FDIC was aware of the importance of its suit in gaining settlement. A memorandum prepared by the FDIC and other agencies stated that "it is clear that the FDIC and OTS claims combined would not have enough value to swing a trade for the redwoods."[118] The direct evidence that the FDIC continued the litigation with an improper purpose of harassment or increased costs arises in another statement from Williams, where he declared, "As I suggested many months ago, it may be advantageous to tie him [Hurwitz] up in lengthy depositions and commence a moderately aggressive discovery plan of our own that inconveniences him and strengthens our case."[119] This persuades us that the district court's finding of improper purpose with respect to the FDIC's manner in prosecuting the suit was not clearly erroneous. Several of FDIC's tactics support the court's finding that the FDIC improperly used the court to delay the case and harass Hurwitz. Although many of the proceedings under the district court case involved Hurwitz's motions to dismiss, requests for discovery, and motions for sanctions, there is evidence that the FDIC made many motions to

---

[117] E-mail from Jeffrey Williams, FDIC to Jack Smith, FDIC (Apr. 3, 1995).

[118] 384 F. Supp. 2d at 1082.

[119] Id. at 1083 (emphasis added).

protect privileged documents and to resist discovery.[120] It also attempted to stall the case by requesting two stays. These tactics may have legitimately been pursued to avoid duplicative proceedings, as the FDIC alleged that it was, and is not independently improper as discussed infra in the context of the OTS proceeding, but the district court's finding that the FDIC's actions, considered collectively, directly interfered with its proceedings and caused harassment and delay is not clearly erroneous or an abuse of discretion – excessiveness animated at least in part by the redwoods.

To recapitulate, we affirm the court's sanctions for the costs of the case before it on the narrow grounds that, under Rule 11, the FDIC improperly pursued the case to delay the case and increase the costs of litigation. Because the court grounded its sanctions for the FDIC and ancillary proceedings in its findings that the FDIC filed frivolous pleadings with an improper purpose and

---

[120] See, e.g., Federal Deposit Insurance Corporation's Response to Maxxam's Motion to Compel Pre-Suit Materials Because of Waiver (May 19, 2003) (arguing that "while many of the documents sought are covered by the attorney-client privilege, they are also covered by the attorney work-product privilege"); Federal Deposit Insurance Corporation's Motion to Exclude Evidence (Jan. 15, 2003) (moving "to exclude from this Court's consideration on both the Defendant's pending sanctions motion and counterclaim any evidence pertaining to the allegations of a 'debt-for-nature' conspiracy or transaction"); Federal Deposit Insurance Corporation's Motion for a Protective Order (Apr. 25, 2001) (requesting the court to "enter a Protective Order . . . quashing the Deposition Notice that has been issued for William F. Kroener, III, the FDIC's general counsel"); FDIC Responses to Hurwitz First Set of Discovery Requests Regarding Counterclaim (July 13, 2000) (objecting to multiple discovery requests); FDIC's Response to Hurwitz's Renewed Motion to Compel Production fo the Draft ATS Memorandum (May 20, 1998) (arguing that "[t]he document constitutes attorney work product and is also protected by the attorney-client privilege and deliberative process privileges"); Federal Deposit Insurance Corporation's Motion for a Protective Order and Request for Expedited Consideration (Apr. 21, 1998) (moving to quash "the deposition notices that have been issued for Nicholas P. Retsinas and Jonathan L. Fiechter"); Federal Deposit Insurance Corporation's Motion for a Protective Order and Request for Expedited Consideration (Apr. 9, 1998) (moving to "quash the deposition notice that has been issued for Andrew C. Hove"); Declaration of Andrew C. Hove (asserting privilege for the "tape recording, transcript, and minutes" from the board meeting, which Hurwitz requested) (Mar. 18, 1998); FDIC's Memorandum in Opposition to Defendant Charles E. Hurwitz's Motion to Compel Discovery and for Sanctions (Apr. 4, 1996) (arguing that Hurwitz "has received or is receiving all of the non-privileged documents he has requested. He has no right to privileged documents"); Memorandum of Law of the Federal Deposit Insurance Corporation in Support of its Motion for an Order Directing Return of Privileged Documents and Other Relief (Apr. 1, 1996).

prosecuted the suit to delay the case and increase costs,[121] we VACATE and REMAND this portion of the sanction for further proceedings consistent with this opinion.

## III

In addition to issuing sanctions for improper purpose under Rule 11 and its inherent power, the district court rested on its inherent power to sanction the FDIC for the costs of the OTS proceeding, totaling $56,920,241.53.[122] We review de novo a district court's invocation of its inherent power and the sanctions granted under its inherent power for an abuse of discretion,[123] recognizing that "[a] court should invoke its inherent power to award attorney's fees only when it finds that 'fraud has been practiced upon it, or that the very temple of justice

---

[121] The court parsed its sanctions with respect to the various proceedings in the case, including the FDIC, ancillary, and OTS administrative proceedings. For example, the district court held, "If only the expenses in this case [not the expenses arising from OTS's administrative proceeding] are recoverable, this court makes that contingent finding that the FDIC must pay $15,334,905.98." 384 F. Supp. 2d at 1119. The court did not parse the costs with respect to its reasons for the sanctions; it did not find, for example, that of the approximate $15 million in damages arising from the FDIC proceeding, a certain portion was for filing the case in bad faith, and another portion was for delaying and harassing Defendants after the suit was filed. The court's basis for sanctions included mixed reasons of bad faith and delay; it held, "The FDIC's improper purpose in suing Hurwitz is objectively ascertainable. The agency wanted to placate environmentalists and politicians, not redress the failure of th thrift. . . . Besides suing for an improper purpose, the FDIC's sanctionable conduct includes: Filing imaginary claims, unfounded in law and fact. Objectively and subjectively, the FDIC sued in bad faith; Suing despite its extensive investigation that concluded that Hurwitz was not guilty of actionable conduct; Engaging in abusive investigation that in at least one instance involved an FDIC attorney asking a witness to 'rethink' his testimony to avoid a personal suit; Pursuing this case -- in the face of its and its internal and external lawyers' opinions about the lack of merit -- either to extort environmental concessions or appease those in and out of government . . . ; Trying to delay the case at each opportunity; Failing to pursue its claims and seek meaningful discovery; Trying to thwart nearly all depositions of its officials; Repeatedly obstructing documentary discovery . . . .; Trying to avoid dismissal on the merits by amending its complaint and leaving only an unripe – but equally bad – claim; Suing here first and then instigating, paying for and supervising – and hiding its role in – a second proceeding . . . ; Trying to hide its illegal arrangement; and Engaging in an open war of attrition." Id. at 1111-12.

[122] Id. at 1119.

[123] Chambers, 501 U.S. at 54.

has been defiled.'"[124]  We upheld the inherent power of courts to issue sanctions beyond those available in sanctions rules in NASCO v. Calcasieu Television & Radio,[125] which the Supreme Court subsequently affirmed in Chambers.[126]  In Calcasieu, we found that "federal courts enjoy a zone of implied power incident to their judicial duty,"[127] and that this inherent power is "'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs.'"[128] However, like the power to sanction vested in courts by Rule 11,

> [t]o the extent that inherent power is seen as a product of necessity, it contains its own limits.  It is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function.[129]

The purpose of the inherent power is to "control the litigation before . . . [the court]."[130]  In Chambers, the Supreme Court held that a district court may sanction parties for conduct that occurs in portions of the court proceeding that are not part of the trial itself.[131]  We have qualified Chambers by emphasizing that its rule allows sanctions for conduct beyond that occurring in trial when a party engages in "bad-faith conduct" which is "in direct defiance of the

---

[124] Boland Marine & Mfg. Co. v. Rihner, 41 F.3d 997, 1005 (5th Cir. 1995) (quoting Chambers, 501 U.S. at 46).

[125] Nasco, Inc. v. Calcasieu Tel. & Radio, 894 F.2d 696, 703-04 (5th Cir. 1990) (holding that "the rules of civil procedure did not displace a district court's power to shift fees for bad faith wanton and vexatious conduct in the prosecution of the case").

[126] Chambers, 501 U.S. at 58.

[127] 894 F.2d at 702.

[128] Id. (quoting Link v. Wabash R. Co., 370 U.S. 626, 630 (1962)).

[129] Id. at 702.

[130] Id. at 703.

[131] Chambers, 501 U.S. at 44.

sanctioning court."[132] Additionally, the Chambers Court authorized sanctions reaching "beyond the court's confines" expressly with the purpose of allowing courts to sanction parties for conduct that was not "'merely the disruption of court proceedings'" and not limited to "disobedience [that] interfered with the conduct of trial'" – to address problems arising from "disobedience to the orders of the Judiciary."[133] Although the FDIC paid for OTS's investigation and proceeding, and suggested causes of action in that proceeding, this did not constitute disobedience of the district court's orders or "direct defiance" of the sanctioning court.

Maxxam contends that the sanction properly "reached the FDIC's use of OTS as a stalking horse to pursue the Appellees in its preferred forum for improper reasons" and the district court found similarly,[134] but the FDIC also had legitimate purposes for supporting actions in both the district court and the administrative forum. First, OTS operates under a six-year statute of limitations, thus allowing it to pursue individuals responsible for thrift failures after thoroughly investigating those failures. The FDIC operates under a tighter two-year statute of limitations, and has worked with OTS in the past on thrift failures for this very reason.[135] The FDIC has also historically reimbursed OTS for its investigative costs in matters that resulted in restitution to the FDIC, although it has not typically paid the "ongoing" costs of OTS investigation and

---

[132] CJC Holdings, 898 F.2d at 794 (emphasis added).

[133] Chambers, 501 U.S. at 44 (emphasis added) (quoting Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 798 (1987)).

[134] The district court concluded that the arrangement between the FDIC and OTS was illegal. The administrative law judge had earlier rejected Maxxam's similar challenge to OTS authority, which contested OTS's authority to bring suit.

[135] Memorandum from Kenneth J. Guido, Jr., Special Enforcement Counsel, and Bryan T. Veis, Special Counsel, OTS, to Carolyn B. Lieberman, Chief Counsel, FDIC, at 1 (undated).

enforcement.[136] But the board meeting and memoranda leading up to the board meeting where the FDIC decided to sue, show that the FDIC faced a difficult decision: it was unsure of whether OTS would pursue an administrative proceeding related to the thrift's failure, yet Hurwitz had refused to sign another tolling agreement with FDIC for the statute of limitations.[137] If the FDIC did not file suit and OTS decided not to pursue the case, it would have lost all claims against Hurwitz, whom the FDIC believed was directly involved in the thrift's failure. And the FDIC was aware that Congress was concerned about the failure.[138] Furthermore, the administrative court in the OTS proceeding rejected Maxxam's "arguments challenging the statutory authority of OTS to bring the proceeding,"[139] finding those arguments to be "without merit."[140]

Nor did the OTS action directly interfere with the district court's authority. The administrative court in the OTS matter held long hearings and invested numerous hours in that case, concluding with a lengthy opinion dismissing the claims.[141] This did not require the efforts or resources of the district court, despite that court's joining OTS as a party in the federal suit and soon after dismissing OTS when FDIC dropped some of its claims. Additionally, the FDIC twice requested and the district court twice rejected that the court stay

---

[136] Id.

[137] Williams testified that "the FDIC from the beginning [when] it filed that civil case against Mr. Hurwitz made it abundantly clear to Mr. Hurwitz and its representatives, as well as the federal judge, that we had no option but to file against Mr. Hurwitz in August of 1995 when he surprisingly refused to extend the tolling agreement with the FDIC to preserve its civil claims against him. Subsequently, we gave Mr. Hurwitz two opportunities [to stay the case]: responding directly to his or his agents' vigorous representations of how difficult it would be for him to defend himself in two forums at the same time . . . both of which he rejected."

[138] See supra note 22 and accompanying text.

[139] USAT v. Maxxam, OTS AP 95-40, Recommended Decision, Arthur L. Shipe, Administrative Law Judge, at 12.

[140] Id.

[141] Id. at 247-48.

the case until the administrative proceeding concluded. Although this stalled the district court's case, to that court's displeasure, it is a common practice for agencies to bring parallel proceedings, and agencies may also request a stay of one proceeding pending the outcome of another. In SEC v. First Financial Group of Texas, we held,

> There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions. Parallel civil and criminal proceedings instituted by different federal agencies are not uncommon occurrences because of the overlapping nature of federal civil and penal laws. The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to vindicate the different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums. The Supreme Court recognized that the federal government may pursue civil and criminal actions either 'simultaneously or successively' in 1912 in Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 52 (1912) and reaffirmed this principle in 1970 in United States v. Kordel . . . ."[142]

"In 'special circumstances' . . . a district court should stay one of the proceedings pending completion of the other to prevent a party from suffering substantial and irreparable prejudice."[143] District courts have also recognized parallel agency actions. In Newby v. Enron Corporation, for example, the court noted that "the alleged scheme to defraud investors and the public with the same actions by Defendants has given rise to the parallel civil, criminal, and even administrative (SEC enforcement) proceedings."[144]

---

[142] 659 F.2d 660, 666-67 (5th Cir. 1981).

[143] Id. at 668 (citations omitted).

[144] 391 F. Supp. 2d 541, 570 (S.D. Tex. 2005).

Chambers does not grant such broad inherent power to support the district court's imposition of more than $50 million in sanctions for a proceeding that was not before the district court and did not challenge the district court's authority in the FDIC suit, particularly because that court rejected the FDIC's efforts to stay its case pending the OTS proceedings' outcome. The OTS proceeding addressed different legal issues and prosecuted six defendants who were not involved in the FDIC case. If anything, the OTS proceeding verifies that the FDIC and OTS also had a legitimate purpose in bringing the suit – by pursuing multiple individuals who were involved in USAT's downfall and were not involved in the redwoods deal, OTS attempted to obtain restitution for U.S. taxpayers and to prevent certain individuals involved in the USAT downfall from directing other banking institutions.

Chambers expressly upheld the court's "inherent power to police itself, thus serving the . . . purpose of 'vindicat[ing] judicial authority'"[145] but did not grant a district court the power to police the administrative courts – where the OTS is statutorily required to pursue enforcement matters – when those courts do not threaten the court's own judicial authority or proceedings. Moreover, we have found that the court's inherent power to sanction does not extend to "'the underlying conduct that gives rise to a . . . claim.'"[146] To the extent that the FDIC engaged in underlying conduct that the district court found distasteful, such as paying the OTS to bring a case in administrative court,[147] it is not within the court's power to sanction such conduct. The district court was aware that at

---

[145] Id. at 46 (emphasis added) (quoting Hutto v. Finley, 437 U.S. 678, 689 n.14 (1978)).

[146] Galveston County Navigation Dist. No. 1 v. Hopson Towing Co., 92 F.3d 353, 359 n.13 (5th Cir. 1996) (quoting Guevara v. Maritime Overseas Corp., 59 F.3d 1496, 1503 (1995)); see also Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 766 (10th Cir. 1997) (citing, inter alia, Galveston County, 92 F.3d at 359 n.13)) ("Our sister circuits that have squarely addressed this issue have also held the [bad faith] exception [to the American Rule] does not reach purely prelitigation bad-faith conduct.").

[147] The district court described this conduct as illegal. 384 F. Supp. 2d at 1047.

best, sanctions for the OTS proceeding were at the outer reach of its inherent power, properly making an alternative award of expenses. It held that "[i]f only the expenses in this case are recoverable, this court makes the contingent finding that the FDIC must pay $15,334,905.98."[148] We are persuaded that in imposing the $50 million in sanctions for an administrative proceeding in Washington, DC, the district court abused its discretion, and that only the costs related to the district court proceedings are sustainable.

For the $1,192,838.82 in costs imposed for "ancillary" proceedings, the court determined that the proceedings "were necessary because the government refused to produce documents to which Hurwitz was entitled. Though most of those actions were against OTS, they related directly to the FDIC's case here."[149] We are unable to determine from the opinion which of these costs related solely to the OTS proceedings, and which were directly intertwined with or interfered with the district court's proceedings. The district court is in a better position to delineate these costs; we therefore VACATE and REMAND this portion of the sanction for further proceedings consistent with this opinion.

IV

For the sanctions that arose from the district court proceedings, the court awarded $6,959,876.96 in interest on the cost of attorney's fees. We review a district court's imposition of sanctions for abuse of discretion, but we review de novo whether sovereign immunity prevents sanctions assessed against a government entity.[150] The district court assessed an interest award under its inherent powers based on "the cost of the delay for the fees and expenses,"[151]

---

[148] Id. at 1119; see also id. at 1120 ("If the court of appeals allows recovery for the costs of only this action, the FDIC will pay Maxxam $15,334,905.98.").

[149] Id. at 1119-20 (emphasis added).

[150] See, e.g., United States v. Woodley, 9 F.3d 774, 781 (9th Cir. 1993).

[151] 384 F.Supp. 2d at 1119.

determining that it would use "current pricing" of the award "to compensate for harm inflicted through the suit itself."[152]  In other words, the court based part of its sanctions award on "Maxxam's cost of borrowing the money that it needed to cover defense costs," or the "attorney fees actually paid . . . [adjusted] for the delay in repayment."[153]

The FDIC argues that this was an award of prejudgment interest and that sovereign immunity prevents the district court from assessing prejudgment interest as part of its sanctions.[154]  Hurwitz argues that, even if the FDIC were acting as a government entity rather than a receiver, the court could assess prejudgment interest against the FDIC because of the broad scope of the court's inherent power, relying on United States v. Woodley[155] and Bradley v. United States.[156]  The district court found that "including the measure of the costs of delay is not the same as granting prejudgment interest in an ordinary case,"[157] and that even if the award were labeled as prejudgment interest, the FDIC did not act in its governmental capacity here but rather its institutional capacity as a receiver,[158] thereby making it liable for the costs even if they were labeled as

---

[152] Id. at 1120.

[153] Id. at 1118-19.

[154]  The FDIC also contests the court's method of determining the costs, arguing that the costs are "unsupported and excessive."  The district court relied on detailed spreadsheets of invoiced amounts for Defendants' legal services and provided reasons for the amount of the award.

[155] See supra note 150.

[156] 866 F.2d 120 (5th Cir. 1989).

[157]  Hurwitz, 384 F.Supp. 2d at 1120.

[158] The FDIC argues that it was acting in its corporate capacity, not as a receiver, since "FLSIC transferred all of its claims as receiver against Hurwitz to FSLIC in its corporate capacity.  When FSLIC was abolished, FDIC acquired that assets of FSLIC in its corporate capcity [not in its receivership capacity]." (emphasis added).  The FDIC cites to 12 U.S.C. § 1823(d)(1) in support of its claim.  Section 1823 (d)(1) provides, "Any conservator, receiver, or liquidator appointed for any insured depository institution in default, including the

"prejudgment interest."[159]   The district court did not abuse its discretion in so holding; nor did it err in assessing interest against a government entity with limited sovereign immunity.[160]

The question of the scope of a waiver of sovereign immunity falls away when a court acts under its sanctioning powers and does not abuse its discretion in so doing. The threshold question in a sanctions case is whether the court has the power to sanction a party for frustrating its Article III functions. The government, as a party to a lawsuit, is subject to the same ethical and procedural rules as a private litigant, and risks the same sanctions if it fails to abide by these rules.[161] As discussed above, the district court did not abuse its

---

Corporation acting in such capacity, shall be entitled to offer the assets of such depository institutions for sale to the Corporation or as security for loans from the Corporation." The FDIC also cites to FDIC v. Henderson, which determined that where FLSIC acted as a receiver and "sold certain of the institutions' assets to the FSLIC in its corporate capacity," its assets vested in the FDIC and the FDIC could then sue "pursuant to its authority under FIRREA." 61 F.3d 421, 422 n.1 (5th Cir. 1995). Because our holding does not rest on the FDIC's acting in its capacity as a receiver, we do not address this question.

[159] Hurwitz, 384 F.Supp. 2d. at 1120. The court again asserts, however, that the "delay" award is not ordinary prejudgment interest, stating, "Since the FDIC sued in its capacity as the thrift's receiver, it is liable for prejudgment interest, but that is not what is happening here." Id.

[160] The FDIC's organic statute allows the agency "to sue and be sued, and complain and defend, in any court of law or equity, State or Federal." 12 U.S.C. § 1819 (a) (cited in FDIC v. Meyer, 510 U.S. 471, 475 n. 3 (1994)). The Supreme Court has since interpreted this as "a 'broad' waiver of FSLIC's [now FDIC's] immunity from suit." Meyer, 510 U.S. at 475 (citing United States v. Nordic Village, Inc., 503 U.S. 30, 34 (1992)). A general waiver of immunity, however, does not automatically waive an agency's immunity from prejudgment interest. See, e.g., United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 588 (1947) (discussing "the traditional rule that interest cannot be recovered against the United States upon unpaid accounts or claims in the absence of an express provision to the contrary in a relevant statute or contract"). But see Spawn v. Western Bank–Westheimer,  989 F.2d 830, 833 (5th Cir. 1993) (discussing exceptions to the "no interest" rule).

[161] See, e.g., Bradley, 866 F.2d at 126 ("All parties are expected to conform their conduct to these rules ['the rules by which all parties must operate when appearing before federal district courts'], or face sanctions for their failure to do so; this is even more true for the federal government, a party that regularly appears before the federal courts, knows the rules by which they operate, and is even at times a special beneficiary of those rules.").

discretion in assessing sanctions against the FDIC for prosecuting the case with at least the intent to delay and increase Hurwitz's costs.

Although neither Woodley nor Bradley held that a court may pierce sovereign immunity to assess sanctions for interest specifically, they affirmed the broad supervisory powers of a court to sanction a government entity. Where the court has provided an explanation of the costs it assessed in sanctions, we are hesitant to parse those costs artificially into portions that are or are not barred by sovereign immunity. Provided that the amount of the sanctions relates to the purpose of those sanctions – controlling the proceedings before the court – the bulk of our inquiry is complete.

In Woodley, the Ninth Circuit held that "[s]overeign immunity does not bar a court from imposing monetary sanctions under an exercise of its supervisory powers,"[162] even where a government entity has not expressly waived sovereign immunity.[163] We similarly authorized monetary sanctions in Bradley, finding that the court should not have left "unsanctioned" the government's conduct of introducing late expert witnesses that prejudiced the case[164] and instructing the district court on remand that "pursuant to its inherent power to enforce its own rules" it should consider "requiring the government to compensate the Bradleys and their counsel for their expenses attributable to the government's conduct."[165]

The district court's sanctions in this case in the form of the cost of attorney's fees, including the cost of money to pay for those fees, are no different from an assessment of the expenses "attributable to the government's conduct."

---

[162] 9 F.3d at 782.

[163] See id. at 781. But see id. at 782 (finding that "the court identified no violation of any statute, constitutional or other recognized right except, perhaps, Rule 16 as a basis for exercising its supervisory powers" and reversing the court's monetary sanctions against the government).

[164] Bradley, 866 F.2d at 127.

[165] Id. at 128.

As the First Circuit held in Goya Foods, Inc. v. Wallack Management Co., where the court acts under its inherent powers to issue sanctions against a private party for contempt,

> [i]f the purpose of remedial contempt sanctions is to make an aggrieved party whole, then it follows that a court should be able to fashion sanctions that take into account not only the actual loss stemming from the contumacious conduct but also the time value of any associated deprivation of funds.[166]

The court's inherent powers are of course not unlimited.

> Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.[167]

The assessment of attorneys' fees and interest on those fees is an appropriate sanction in this case. "[A] court's discretion [in sanctioning for contempt] . . . permits the court to impose as part of the fine attorney's fees representing the entire cost of the litigation."[168] The district court's assessment of costs is unlike a traditional award of prejudgment interest,[169] such as a pre-existing debt that a defendant failed to pay to a plaintiff, wherein the non-payment of money deprived the plaintiff of funds and the interest on those funds. Rather, it captures the actual costs of the attorney's fees by including the cost of a loan that might be required to pay those fees – i.e., the opportunity cost of

---

[166] 290 F.3d 63, 79 (1st Cir. 2002); see also id. (holding that "prejudgment interest, as a theoretical matter, is an acceptable component of a remedial sanction for civil contempt" and quoting the holding in McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949), that "[t]he measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief").

[167] Chambers, 501 U.S. at 44-45.

[168] Id. at 45 (citing Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 428 (1923)).

[169] But see Gore, Inc. v. Glickman, 137 F.3d 863, 868 (5th Cir. 1998) ("Prejudgment interest, like any other interest, is to compensate one for the time value of money.").

money that could have been used for other purposes but instead went to the payment of fees.[170]

Even if we were to label the costs as "prejudgment interest" and to address the question of the extent to which the FDIC waived sovereign immunity, if FDIC were acting in its capacity as a receiver,[171] it would not likely be immune from an assessment of prejudgment interest. Since we address the costs of delay awarded as part of sanctions, rather than traditional prejudgment interest, we leave that issue for another day.[172]

---

[170] We have addressed the costs of delay only in the context of a judgment, rather than a sanctions award, holding in Shaw that a government entity with sovereign immunity cannot be held liable for "claims grounded on the belated receipt of funds, even when characterized as compensation for delay." 478 U.S. at 322. Although we have not addressed a court's sanction award for the costs of delay, the Supreme Court and the Seventh Circuit have in awarding fees under Rule 11 and other statutory provisions for fees. In Missouri v. Jenkins, the Supreme Court held that when awarding attorney's fees under 42 U.S.C. § 1988, "an appropriate adjustment for delay in payment–whether by the application of current rather than historic hourly rates or otherwise" is permissible. 491 U.S. 274, 283-84 (1989). The Seventh Circuit in Brandt v. Schal Assoc., Inc. upheld a district court's award of interest on attorney's fees for the "delay factor" and affirmed the district court's holding that awarding delay damages does not violate Cooter & Gell v. Hartmax Corp. 960 F.2d 640, 645, 649 (7th Cir. 1992) (citing 496 U.S. 384 (1990)).

[171] The FDIC disputes that it acted as a receiver here. See supra note 158.

[172] See, e.g., Spawn, 989 F.2d at 833 (quoting McGehee v. Panama Canal Comm'n, 872 F.2d 1213, 1215 (5th Cir.1989)) (holding that a government agency may lose its immunity to interest sanctions if "'Congress has shed the cloak of sovereignty and given an agency the status of a commercial operation'"); see also Meyer, 510 U.S. at 482 (1994) (quoting Franchise Tax Bd. v. United States Postal Serv., 467 U.S. 512, 520 (1984)) (where "claimant . . . was seeking to hold the agency liable just like 'any other business,' it was only natural for the Court to look to the liability of private businesses for guidance"); O'Melveny & Myers v. FDIC, 512 U.S. 79, 86 (1994) (finding that "Section 1821(d)(2)(A)(I), which is part of a title captioned 'Powers and duties of [the FDIC] as . . . receiver,' states that 'the [FDIC] shall, . . . by operation of law, succeed to–all rights, titles, powers, and privileges of the insured depository institution . . . .' 12 U.S.C. § 1821(d)(2)(A)(I) (1988 ed., Supp. IV). This language appears to indicate that the FDIC as receiver 'steps into the shoes' of the failed S&L"); Loeffler v. Frank, 486 U.S. 549, 554-55 (1988)) (holding that "sue and be sued" provisions of agencies should be liberally construed and that "'authorization of suits against federal entities engaged in commercial activities may waive sovereign immunity from awards of interest as an incident of suit'"); N. Bank v. Fed. Deposit Ins. Corp., 496 N.W.2d 459, 467 (Neb. 1993) (holding that there is a "significant distinction" between FDIC in its corporate capacity and its receivership capacity; where FDIC acts as a receiver, it is not immune from prejudgment interest).

V

We therefore REVERSE the district court's award of $56,920,241.53 in principal and interest for the OTS action. We VACATE and REMAND the award of $1,192,838.82 of principal and interest for the ancillary actions for the court to determine which of the costs were for actions that interfered with the court's proceedings. Finally, we VACATE and REMAND the award of $14,142,067.16 in principal and interest for the FDIC suit for the court to determine which of the costs resulted from the FDIC's manner of prosecuting the suit to cause harassment and delay.